## AERONAUTICAL CORPORATION OF AMERICA v. GOSSETT.

### No. 12353.

Court of Civil Appeals of Texas. Dallas.
April 30, 1938.

Rehearing Denied May 28, 1938.

William Burrow, of Dallas, for appellant.

Hughes & Monroe and P. P. Ballowe, all of Dallas, for appellee.

BOND, Chief Justice.

Appellant instituted this suit against appellee, Claude Gossett, upon a note and for foreclosure of a chattel mortgage on a second-hand or used aeroplane and, pending the suit, caused the aeroplane to be seized by writ of sequestration. Soon thereafter, appellee replevied the aeroplane, by giving bond in the sum of $1,900, with himself as principal, and Joe Marino and G. R. Underwood, as sureties. On September 11, 1935, and while in appellee's possession, the aeroplane was destroyed by fire, resulting in appellant vouching into the suit, by amended petition, the sureties, seeking judgment on the replevy bond for the value of the aeroplane.

Appellee, Gossett, answered by general denial and interposed a plea in abatement, denying that appellant has a right to maintain the suit within this State, it being a foreign corporation without a permit to do business within the State of Texas, and that the transaction involved in the suit was not in interstate commerce. In limine, appellee's plea in abatement was overruled, and, the cause being tried to a jury, at the conclusion of the testimony, the trial judge discharged the jury and entered judgment, dismissing appellant's suit, assigning as ground therefor, that "plaintiff (appellant) not having alleged that it was engaged in interstate business in the transaction sued upon" for that reason "was not entitled to recover".

It will be seen that the primary question involved in his appeal is: Must a foreign corporation, in order to maintain suit within this State, allege that it has a permit to do business in Texas, or that the transac-

tion sued on was in interstate commerce? If such affirmative pleadings are essentially necessary for the maintenance of a suit within this State by a foreign corporation, then, indeed, this appeal should be denied, otherwise reversed.

Appellant alleges that, it "is a corporation, organized and existing under and by virtue of the laws of Ohio, having its corporate domicile, residence and principal place of business in the City of Cincinnati, County of Hamilton, State of Ohio * *". There is no allegation that appellant, "desiring to transact or solicit business in Texas or to establish a general or special office in this State", secured a "permit to transact business in this State", and there is no allegation that the transaction involved in this suit was in interstate commerce.

Article 1529, R.S.1925, specifically prohibits a foreign corporation from transacting or soliciting business in Texas, or from establishing a general or special office in this State, without having a permit to do business in Texas; and art. 1536, Vernon's Ann.Civ.St. art. 1536, provides penalties for the violation of art. 1529, supra, denying to such corporations the right to maintain a suit in the courts of Texas. Other than these statutes, there is no prohibition against foreign corporations suing in Texas courts, and such statutes, under the provisions of the interstate commerce clause of the Federal Constitution (U.S.C.C.A. Const. art. 1, § 8, cl. 3), are not effective to prohibit interstate transactions. The transaction or solicitation of business in Texas, prohibited by these statutes, is only in regard to Texas intrastate business; only penalized foreign corporations are prohibited the use of Texas courts. Therefore, it will be seen that, if art. 1529 be violated—that is, if the foreign corporation transacted or solicited intrastate business in Texas, without a permit to do business within this State, then such corporation cannot maintain a suit in this State.

The mere fact that a corporation is alleged to be a foreign corporation does not raise a presumption that the transaction involved in its suit was one which required the corporation to have a permit to do business in this State. The existence of a permit and the character of the transaction, whether interstate or intrastate, are not essential allegations for a foreign corporation; and, in the absence of such allegations, such issues are not raised by appellee's general denial.

We think it is well settled that, unless a foreign corporation's pleadings affirmatively disclose an intrastate transaction, or the corporation has established a general or special office in this State, it is not necessary for such corporation to either allege or prove that, it has a permit to do business in this State; and, in the absence of such pleadings, a general denial raises no presumption of lack of authority to sue in the State of Texas. Allen v. Tyson-Jones Buggy Co., 91 Tex.. 22, 40 S.W. 393, 714; Brin v. Wachusetts Shirt Co., Tex.Civ.App., 43 S.W. 295; Kimball-Krough Pump Co. v. Judd, Tex.Civ.App., 88 S.W.2d 579; Hilker v. Agricultural, etc., Corp., Tex.Civ.App., 96 S.W.2d 544; Phelps v. Jesse French & Sons Piano Co., Tex.Civ.App., 65 S.W.2d 374; Cosey v. Supreme Camp, etc., Tex.Civ. App., 103 S.W.2d 1076; Oklahoma Tool & Supply Co. v. Daniels, Tex.Civ.App., 283 S.W. 217. Accordingly, appellant having alleged that it was a foreign corporation and defendant having answered by general denial, we think, presents no pleadings, regardless of the proof, to deny appellant recovery on its note and foreclosure of its mortgage, and for recovery over against the sureties on the replevy bond. It is fundamental error, we think, for a court to hold, as a matter of law, that a foreign corporation is not entitled to maintain a suit in this State, because of its failure to allege that it had a permit to do business within this State, or to show facts which would require a permit.

In respect to appellee's counter-propositions that the evidence shows the transaction out of which this suit arose, was intrastate, we think, the evidence shows to the contrary. The uncontroverted testimony, in effect is: That appellant (in Cincinati, Ohio) receiving information that appellee, Claude Gossett (of Dallas), was in the market for an aeroplane, wired its salesman, a Mr. Collins, to go to Dallas and contact Gossett relative thereto. Collins was at Waco, Texas, flying a company aeroplane as a demonstrator, seeking purchasers and taking orders, to be shipped from Cincinnati. The company had no other aeroplanes in Texas. Collins came to Dallas, contacted Gossett about the sale of a company-plane, and, in the negotiation, agreed upon a tentative sale of the demonstrator aeroplane. Collins communicated the tentative agreement to the home office, by wire, asking for authority to sell and for confirmation of the price agreed upon, Gossett having agreed

to make a down-payment of $500, and execute notes and mortgage for the balance. The aeroplane was then stored in an airport near Dallas, to be held until Gossett made the down-payment. Subsequently, Gossett, being unable to make the initial down-payment (Collins having left the State) wired appellant, submitting to it a different and counter-proposal, and suggesting a down-payment in a smaller amount. This later proposal was accepted by wire and a new note and mortgage covering the aeroplane were prepared and mailed to Gossett, accompanied by a letter reciting, "As soon as these papers (note and mortgage) are received properly executed, we shall immediately transfer the AB.16 aeroplane to you". On receipt of this letter with inclosures, Gossett executed the note and mortgage, sued on in Dallas, and returned them through the mails to Ohio. They were immediately accepted and thereafter the Company wired the airport storage company, in Dallas, to release the aeroplane to Gossett. The testimony further shows that, previous to this transaction, appellant, through its salesman, had made four other sales transactions in Texas. It is not shown whether such other transactions were intrastate or interstate.

■ It has already been pointed out that, when a foreign corporation enters into a contract, the subject-matter of which is wholly interstate commerce, such corporation cannot be held to be "doing business" within the contemplation of the foreign corporation statutes, and the validity of the contract cannot be assailed on the ground that the statute has not been complied with. In the instant case, the transaction was interstate commerce, and the amount of the indebtedness sued on is not in dispute. It is shown that the indebtedness is $803.50 principal and $34.44 interest, plus ten percent attorney's fee, with ten percent interest per annum on the principal and interest from August 23, 1935 until paid; and the mortgage is on the aeroplane purchased, sequestered by appellant and replevied by appellee's bond of $1,900, with Joe Marino and G. R. Underwood as sureties, and thereafter destroyed by fire; the value of the plane at the time of the replevy was $1,300. Appellant suggests in its brief that, a credit of $35 may be allowed on the principal indebtedness, as a refund for the premium paid by appellee for insurance on the aeroplane, which was received by appellant, and to that extent the credit should be given, anent which there is no dispute. Accordingly, judgment should have been rendered in favor of appellant for the amount of its said indebtedness; and, for a like amount, not to exceed $1,900, over against Joe Marino and G. R. Underwood, sureties on the replevy bond.

Appellee's defense to this suit goes further than to challenge appellant's right to maintain the action because of the above mentioned foreign corporation statute. He contends for an off-set against appellant's note on an implied warranty, consisting of items of $35 for defective bearings, and $125 for a worthless crank-case in the aeroplane purchased; and to that extent, alleges that the consideration for the note in suit has failed; and further, he asks damages in the sum of $1,000, by reason of failure of appellant to carry full coverage insurance on the aeroplane against fire, theft, crash or collision to the extent of $1,000. On the latter item, he alleges in an amended petition that, at the time of the purchase of the aeroplane and the execution of the note and mortgage sued on, appellant included in said note the sum of $140, as premium for the purchase of a policy of insurance, insuring the worth of said aeroplane to the amount of $1,000, for the benefit of appellant, protecting its security, in the event said aeroplane was destroyed by accident or fire. He further alleges that the policy of insurance was issued to and held by the mortgagee until the filing of this suit and thereafter cancelled by it without his knowledge or consent, resulting in damage to him in the sum of $1,000, caused by the aeroplane accidentally crashing and being totally destroyed by fire. In a supplemental petition, appellee alleges that, by false and fraudulent representations made to him by appellant's agent and representative, L. H. Collins, he was induced to include $140 in the purchase price of the aeroplane as a premium for full insurance coverage—on fire, theft, crash or collision—for the sum of $1,000, less $100, deductible for crash, and relying upon such representation, he executed the note and mortgage sued upon; that appellant did not furnish to him a policy of insurance agreed upon, and, on account thereof and the accidental destruction of the aeroplane by fire, he has been damaged in the sum of $750.

In answer to appellee's above cross-action and off-set, appellant denies any implied warranty in the sale of the aeroplane purchased by appellant, and affirmatively alleges that, at the time of the alleged trans-

action, it executed to appellee a written warranty, which recites that, "We guarantee Aeronca airplanes against defects in workmanship and material under normal use, our obligation being limited to. making good at our factory any part thereof which shall, within three (3) months after delivery of the airplane to the original purchaser be returned, by our authority, to us transportation charges prepaid, and which upon examination by us shall disclose to have been defective", and that the defendant had, and has, in his possession said written warranty, which was accepted by him in lieu of all other warranties, express or implied, and is bound thereby.

As to the item of alleged damage arising out of the cancellation of or refusal to furnish the insurance policy, appellant alleges that the Hartford Fire Insurance Company had issued to it a master insurance policy which covered all damage by fire, theft, crash or collision of all aeroplanes sold by, appellant under mortgage, and had attached to said policy an endorsement to include the coverage on the aeroplane sold to the defendant (appellee); that the endorsement recites, "The insurance shall be on a basis of $1000 beginning November 26, 1934, and there shall be a minimum basis of depreciation of 1⁄12th of that amount monthly; and that, in the event of a crash, there shall be a further deduction of $100". It is further alleged that, in November 1934, the defendant had been furnished with copy of the policy covering the Insurance Company's liability on the aeroplane; that he knew its terms and conditions—that it was issued only for the benefit of appellant, and that appellant, at its option, had the right to cancel the policy at any time.

 With regard to appellee's defense of implied warranty, the testimony shows that appellee was an expert on aeroplane motors; that before purchasing the aeroplane, he knew it was a second-hand machine, used as a demonstrator; and that, before purchasing it, he inspected and flew the plane. Appellant's salesman also testified that appellee tested the aeroplane and made a close investigation thereof. It is further shown in the evidence that, at the time of the sales transaction, appellant mailed to appellee an express warranty against defects in workmanship and materials, limiting their warranty to make good at their factory any part which shall, within 90 days after delivery of the aeroplane, be returned, and on examination by them

disclose to have been defective. The evidence further shows, that appellant received and accepted the express warranty, and thereafter within the limited period for repairs, acted thereon by returning defective parts of the aeroplane to the factory.

Where an expert, buying a second-hand article, tests the article and relies on his own knowledge, he deals with equal opportunity with the salesman, and there is no implied warranty. A warranty may be implied only where the buyer has no opportunity to inspect the article before accepting it. Young v. Robinson, Tex.Civ. App., 135 S.W. 715; Greenlee v. Consolidated Oil Co., Tex.Civ.App., 241 S.W. 599. Furthermore, the sale of a second-hand or used article raises no implied warranty, condition or fitness for the purpose intended, where there is an express warranty which is inconsistent with or negatives an implied warranty. Joy v. National Exchange Bank, 32 Tex.Civ.App. 398, 74 S.W. 325; American Soda Fountain Co. v. Palace Drug Store, Tex.Civ.App., 245 S.W. 1032. So, in the instant case, the trial court concluded, as a matter of law, that there was no implied warranty in the sale of the aeroplane, and that appellee could not recover for any item set up on account thereof, we think the law and the undisputed facts support the conclusion of the trial court.

 With regard to the cross-action for damages, growing out of the insurance policy, it is undisputed that appellee received a copy of the rider or endorsement, as recited above, which appellant secured from the Hartford Fire Insurance Company and attached to its master insurance policy; that he accepted the policy's endorsement without reading it, believing, as he says, by the representations of appellant's agent, made at the time of the purchase, that he was fully protected in the sum of $1,000, less a deduction of $100 in case of crash. Appellee admits that, immediately after the purchase of the plane, he received a letter from appellant, dated November 20, 1934, which recites, "The insurance covers fire, theft, wind-storm and crash for $1000, reducing 1⁄12th monthly, and the usual deductibles applying, which, in the case of crash is $100". Likewise, it is undisputed that, in the chattel mortgage executed by appellee it is recited: That appellant has the right to "cancel said insurance at any time and * * * receive the return premium therefor"; that appellant,

at the institution of this suit, on August 23, 1935, in keeping with the provision of said mortgage, but without the knowledge or consent of appellee, cancelled the policy of insurance; and that, on September 11, 1935, the aeroplane was destroyed by fire.

Since an insurance policy was issued to meet coverage of appellee's aeroplane, and its terms and conditions clearly stated therein, and, in due time, sent to appellee, he cannot escape the consequences of his act in failing to read and fully advise himself of its terms and conditions; and having received the written contract, any oral representations which appellant or its agent and representative may have made prior to the sales transaction, were, as a matter of law, merged into the accepted written contract. Distributors Inv. Co. et al. v. Patton, Tex.Com.App., 110 S.W.2d 47. Furthermore, the chattel mortgage executed by appellee specifically provides that the mortgagee (appellant) may cancel any insurance contract carried on the aeroplane, and receive the return premium therefor; and, in accordance therewith, the policy was in fact cancelled prior to the destruction of the plane by fire. It matters not what kind of insurance appellant carried, it had the right to cancel same and having exercised such right, appellee is in no position to complain, and has no cause of action, either for cancellation of the policy or because of the terms and conditions thereof being different from those contracted.

We have carefully considered all assignments and cross-assignments not herein discussed; finding no error therein, they are expressly overruled. And, in view of our conclusions above reached, the judgment of the court below is reversed and here rendered in favor of appellant against appellee, Claude Gossett, and the sureties on the replevy bond, for the sum of $837.94, principal and interest, plus $83.79 attorney's fee, less a credit of $35 on the said principal and interest, with ten percent interest per annum on the balance of the principal and interest from August 23, 1935, until paid, and for all costs of suit.

Reversed and rendered.