CREAMERY PACKAGE MFG. CO. v. CHEYENNE
ICE CREAM CO.

(No. 2125; March 12, 1940; 100 Pac. (2d) 116)

For the appellant, there was a brief by *George F. Guy* and *Philip White* of Cheyenne, and oral argument by *Mr. Guy.*

For the respondent, there was a brief and oral argument by *Vincent Carter* of Cheyenne.

BLUME, Justice.

On March 31, 1936, the plaintiff, the Creamery Package Manufacturing Company, a corporation organized under the laws of Illinois and having a branch office at Denver, Colorado, entered into a contract at Denver, Colorado, with the defendant, the Cheyenne Ice Cream Company, for the shipment to, and installation at, Cheyenne, Wyoming, of certain refrigerating equipment. This equipment, as stated in the contract, consisted of a super-freezer door, a cold storage door, and certain manufactured products consisting of a compressor, a refrigerating machine, a main shaft, flywheel weighing 480 pounds, ammonia condensor six feet long and fifteen inches wide, ammonia receiver, interceptor, gauges, ammonia pipe connections, electric motor of fifteen horsepower, automatic control devices, and other manufactured products. It further agreed to furnish "hardening room to be insulated with eight-inch corkboard in walls, floor and ceiling; anteroom, to be insulated with four-inch corkboard in walls and ceiling, with six-inch corkboard insulation in partition between hardening room and anteroom." The hardening room was to have an average temperature of 10° below zero, and the anteroom an average temperature of plus 40°, the company to furnish the piping. In that connection it was stated that "the company will furnish piping for the circulation of ammonia in the rooms * * * all valves, fittings and hangers. The

piping will be arranged in coils suitable for the purposes for which the rooms are intended. Valves will be placed where required for shutting off any coil or room. The company will furnish necessary connections between coils and balance of the system." The rooms were to contain "1075 ft. 1¼" shelf pipe coils for cooling the above room controlled by 1 -CP 8" x 24" Accumulator & float control for operating flooded system. Coils to be equipped with suction and liquid headers." The plaintiff agreed to furnish one erecting engineer to install the equipment furnished by it and to furnish and pay all other help necessary for the placing, connecting and starting the machinery in operation. The purchaser agreed to furnish all masonry and carpenter work of every description, foundation of all machinery, electrical wiring, suitable openings in the building for the admission of the machinery and openings in walls and partitions for pipelines, and all material necessary to the completion of the contract not specifically mentioned to be furnished by the plaintiff. It was agreed that the purchase price should be $3155.00 upon the following terms, namely: Cash with the order of $1865.00, the balance to be paid in fifteen equal monthly installments of $86.00 each, beginning June 5, 1936. It was agreed that if the purchaser should default at any time in the amounts due under the contract the seller should have the right to retake possession of the property. It was further agreed that "any part of this agreement contrary to the laws of the state in which it is written or executed or to be enforced shall not invalidate any other part of this agreement." The purchaser paid on the down payment the sum of $900 in April, 1936. It was entitled to a credit for freight paid of $190.86. It made a further payment of $588.25 on May 5, 1937, making a total which was credited by the seller on the down payment of $1679.11. The purchaser also paid six of the monthly install-

ments due, but no other, and defaulted in the payments. Thereupon, on February 6, 1937, the plaintiff in this case brought an action in replevin in the district court of Laramie County to recover possession of the property sold to the defendant. An answer was filed in that case, setting up the fact that plaintiff was not entitled to recover on the contract because of the fact that it was not domesticated in this state. The plaintiff thereupon dismissed that action, domesticated on May 1, 1937, and brought this action on February 15, 1938, to recover the balance due under the contract. The court, after the trial of the case, rendered judgment in favor of the defendant and from that judgment plaintiff has appealed.

1. On May 5, 1937, the defendant paid the sum of $585.25 on the contract and demanded that it be credited on the deferred payments, and now claims that if that had been done the whole amount due to the plaintiff would be paid. It seems, further, that when the conditional sales contract was filed of record in Laramie County, Wyoming, an affidavit was attached thereto stating that the balance due was $1290.00. This did not take into consideration the amount then due on the down payment. It is the theory that the contract recites that the down payment was received and that this recital cannot be contradicted by parol testimony. The contract does not, in fact, contain any such recital. It merely recites, in stating the terms of the consideration, that the down payment should be $1865, but only $900 was actually paid. Even if the statement might be considered as a recital of having received that sum, that would be immaterial. Such recital "in a written instrument as to payment of the consideration is merely in the nature of a receipt and may be contradicted." 22 C. J. 1167. The facts in this case do not fall within any exception to that rule. The affidavit above mentioned, reciting that only $1290 was due at

the time when the conditional sales contract was filed, would be but an admission which could be contradicted. The uncontradicted testimony in this case shows that the amount claimed by the plaintiff herein is due and owing. The judgment in this case should accordingly have been in favor of the plaintiff, unless the defense hereinafter mentioned is good.

2. Art. 10, Sec. 5, of the Constitution of this state, provides that no corporation organized under the laws of Wyoming Territory or any other jurisdiction than this state shall be permitted to transact business in this state until it shall have accepted the constitution of this state and filed such acceptance in accordance with the laws thereof. Section 28-141, Rev. St. 1931, makes provision to carry the foregoing constitutional provision into effect. The defendant herein pleaded that at the time when the contract above mentioned was entered into, plaintiff had not complied with the foregoing constitutional and statutory provisions; that plaintiff, in carrying out the contract, was doing business in this state, particularly in connection with constructing the hardening room and the anteroom mentioned in the contract. The plaintiff in its reply stated that it neither affirmed nor denied the construction of these rooms. That pleading was improper, and was equivalent to an admission, under Sec. 89-1026, Rev. St. 1931, which provides that every material allegation of new matter in the answer not controverted by the reply shall, for the purpose of the action, be taken as true. See also Building Association v. Clark, 43 O. S. 427; Lake v. Steinbach, 5 Wash. 659, 32 Pac. 767.

Plaintiff also denied that it was doing business in this state, and further alleged, and now contends, that even if it was doing business in the state in performing the contract, the right to set up the defense of non-domestication was waived by the defendant by reason

of the fact that it domesticated in the state on May 1, 1937, and that thereafter, on May 5, 1937, the defendant paid on the contract the sum of $588.25. It is contended that the transaction was at most voidable and not void. We are cited to St. Louis Union Trust Co. v. Chicot etc. Farm Co., 127 Ark. 577, 193 S. W. 69, and Eastlick v. Hayward Lumber & Inv. Co., 33 Ariz. 242, 263 Pac. 936. In the Arkansas case, a note had been given in Missouri to a foreign corporation, which had not domesticated in that state, and which by reason of such non-domestication was void under the laws of Missouri. The maker of the note was held to have ratified the transaction, the court stating that "this ratification resulted from the conduct of the said makers of the note in securing extensions of time and making payments on the note. In other words, the makers of the note treated them as valid at the time when the American Forest Company had complied with the laws of the State of Missouri and was authorized to do business there, and an estoppel to thereafter set up the invalidity of the notes results from such conduct." In the Eastlick case, the court had under consideration a statute providing for the appointment of an agent of a corporation, and that the failure to do so within a certain period, should make all acts and contracts with it null and void at the option of the party interested. A note was given for lumber sold by the corporation. It had no appointed agent, in violation of the statute when the lumber was sold, but it had such agent when the note was given. It was held that when the note was given, it waived its right to set up the violation of the statute. In the case of M. S. Cohen Gravel Co. v. Southern Surety Co., 129 Okl. 71, 264 Pac. 206, the person interested sued the foreign corporation which had not complied with the laws of Oklahoma. The court held that by such suit, it waived the right to set up the defense of non-domestication.

See also Wolfing v. Cork Co., 250 Mo. 723, 157 S. W. 615; LeSueur v. Finance Co., 285 Fed. 490; McMillan v. Petroleum Corporation, 151 Okl. 4, 1 P. (2d) 775. Other cases are to the contrary. The subject is discussed in 14a C. J. 1307, and see National Union Indemnity Co. v. Bruce Bros., 44 Ariz. 454, 38 P. (2d) 648. We do not think that it is necessary to determine at this time whether a person interested may waive the defense of non-domestication in the manner above indicated. The work in this case was completed. All that was done in this case was to make payment of a limited amount on the contract. Waiver or ratification requires, ordinarily at least, a voluntary act with knowledge of the facts. 67 C. J. 298-299; 2 C. J. 476; see also 52 C. J. 1145-1146. The domestication of the plaintiff took place on May 1, 1937; it does not appear that, when the defendant made the payment on May 5, 1937, it had any knowledge thereof, and it would seem that, in the absence thereof, the mere payment should not be held to have any affect on the remainder of the contract. That knowledge of the subsequent domestication is necessary to constitute a waiver of estoppel by subsequent payments is recognized in Wolfing v. Cork Company, supra. We must, accordingly, proceed to determine whether it was necessary for the plaintiff to domesticate in this state in order to recover herein.

3. Counsel for the defendant seems to think that by the fact that the plaintiff company domesticated in this state after it had commenced and dismissed its replevin suit, and after it had made efforts to collect the amount due it, it admitted that it was doing business in this state. L. B. Foster Co., Inc. v. Koppel Ind. Car Equipment Co., 215 N. Y. S. 214, is cited. It is apparent, however, or at least probable, that the subsequent domestication took place under the belief that the failure in that respect would be eliminated from the case, and we do not believe that any importance should be at-

tached to that fact, at least under the circumstances. It is, moreover, difficult to see how that fact could change the nature of the transaction which had previously taken place.

Counsel for defendant rely to a considerable extent on Gould Land and Cattle Co. v. Rocky Mountain Bell Tel. Co., 17 Wyo. 507, 101 Pac. 239, and Interstate Construction Co. v. Lakeview Canal Co., 31 Wyo. 191, 224 Pac. 850. In the Gould case a foreign corporation, not domesticated in this state, and engaged in carrying on within the state a general ranch business, including selling, raising and shipping live stock, sued the Telephone Company for damages for breach of contract in failing to correctly transmit a message over its telephone line. It was held that it was not entitled to recover because it had not complied with the constitution and laws of this state requiring foreign corporations to be domesticated. A like result was reached in the second of these cases, in which the plaintiff, a foreign corporation, and not domesticated here, had undertaken, under contract, to construct a canal in this state. The Gould case is so unlike the case at bar that it cannot be said to furnish any authority herein. The Interstate Construction Company case exhibits a construction contract, while the case at bar appears to be, predominantly at least, a contract of sale and an interstate shipment.

The contract involved herein was entered into at Denver, Colorado, and provided for the shipment from that place to Cheyenne, Wyoming, of certain refrigeration equipment, the character and complexity of which has been set forth above. The shipment was made accordingly. That constituted interstate commerce. 12 C. J. 22, 27-28. The constitution and laws of this state cannot interfere with such commerce, and are not applicable herein, unless it can be said that part of the transaction herein was intrastate, which affected the

whole, so as to make it unenforceable. The question before us, accordingly, is a federal one, and the decisions of the Supreme Court of the United States are the final authority herein. Metal Door & Trim Co. v. Hunt, 170 Okl. 240, 39 Pac. (2d) 72; 101 A. L. R. 350; Aeronautical Corp. v. Gossett (Tex. Civ. App.) 117 S. W. (2d) 893; Bay City v. Frazier, 77 F. (2d) 570; 14a C. J. 1284, 1287; Crespi & Co. v. Giffen, 132 Cal. App. 526, 23 P. (2d) 47. In Browning v. City of Waycross, 233 U. S. 16, 34 Sup. Ct. 578, 58 L. Ed. 828, it was held that affixing lightning rods to houses was carrying on a business local in character, not incidental to the right to complete an interstate transaction. In General Railway Signal Co. v. Virginia, 246 U. S. 500, 38 Sup. Ct. 360, 62 L. Ed. 854, it appears that the General Railway Signal Co. agreed to and did furnish and install certain materials for the completion of a signal system of the Southern Railway Company, covering 147 miles. In the performance of the contract, it employed labor in Virginia, skilled and unskilled, dug ditches in which conduits were laid, constructed concrete foundations and painted and completed signal structures. The work took four to five months' time. It was held that the company was engaged in intrastate business. These cases were referred to and distinguished in the case of York Manufacturing Company v. Colley, 247 U. S. 21, 38 Sup. Ct. 430, 62 L. Ed. 963 (1918), reversing the Court of Civil Appeals of Texas, 172 S. W. 206. In that case, the manufacturing company sold machinery for an ice plant, consisting of gas compression pumps, a compressor, ammonia condensers, freezing tank, brine agitator and other machinery. It agreed to install the machinery under the supervision of an engineer and test the machinery. The installation consumed about three weeks' time. It was held that the whole transaction was interstate, and the installation and testing but incidental thereto;

that the company had the right to incorporate in the contract provisions which are relevant and appropriate to the contract made; that whether or not such provisions are relevant, consideration should be given to the functions of the machinery, its complexity, and the necessity of its aggregation in order to reach the result intended. Since the decision in that case, the cases decided previously and holding that installation work is intrastate must be taken into consideration with caution. Most of the cases cited to us by counsel for the defendant come within that class, having been decided prior to 1918. Nearly all of the cases decided since that time, involving the sale and installation of complicated machinery, have held the transaction to be interstate. Most of the cases decided before and after 1918 have been collected in note 11 A. L. R. 614-623; note 101 A. L. R. 356-365, and see note on a collateral subject, 55 A. L. R. 726-730. In note 55 A. L. R. 726, the author states that "the consensus of opinion is that a mere incidental agreement to assemble a structure sold in interstate commerce does not destroy the nature of the transaction as one of interstate commerce and bring it within state control. On the other hand * * * if the transaction is one in which the sale of a foreign-made product may be regarded rather as an incident of a contract for labor within the state, than as the chief incident of the transaction, the transaction falls within state control, and is not protected by the commerce clause of the Federal Constitution." And the decisions since 1918 have ordinarily turned upon the question whether the transaction came nearer that involved in the York Manufacturing case or that involved in the Waycross case and particularly that involved in the General Signal Co. case. It may be mentioned that the predominant part of the transaction in the last mentioned case was similar to the transaction involved in Interstate Construction Co. v.

Lakeview Canal Co., supra—in other words, the transaction was construed to be a construction contract rather than a contract for sale.

In Bay City v. Frazier, 77 Fed. (2d) 570, the court stated that three different tests exist under Federal decisions for deciding as to whether or not a transaction is interstate or otherwise, namely (1) "that the dominant characteristics of the transaction is interstate, overshadowing the intrastate features * * * (2) that the contract is isolated, indicating a purpose not to carry on business in the state * * * (3) that the intrastate feature is relevant and appropriate to the interstate transaction. In this connection the complexity of the transaction is regarded as one of the controlling factors." There is but one indication, and not a satisfactory one, in the record as to the relative value of the machinery sold, and the installation thereof, including the hardening room and anteroom. The defendant introduced in evidence the bond given by the plaintiff company in the replevin suit already mentioned. That bond was for $6500.00. Under Section 89-4007, Rev. St. 1931, a bond given by plaintiff in replevin must be for double the value of the property taken. The bond given, accordingly, indicates that in the judgment of the plaintiff company herein, the value of the machinery sold herein was then approximately worth the amount of the sale price, and that the cost of the installation was of comparatively minor importance. See also McCaskey Register Co. v. Mann (Tex. Civ. App.) 273 S. W. 1113.

The second test above mentioned is as to whether or not the transaction is isolated or not. Most of the courts seem to hold such isolated transactions not violative of the law prohibiting foreign corporations from doing business in the state. 14a C. J. 1273-1276. The defendant thinks that this question depends upon the whole transaction. They produced two witnesses. All that

they testified to is the fact that the plaintiff installed some equipment for them. The installation, of course, may have been clearly incidental to interstate commerce, so that the testimony seems to be of no importance herein. It is very doubtful that the interpretation as to what is an isolated transaction is correct. If certain work is in fact incidental to interstate commerce, it makes no difference how great in number the work may be; in each case the character remains the same. If installation work is merely incidental to such commerce, the accumulation in number cannot change the interstate commerce to intrastate. Williams v. Golden & Crick, 247 Pa. 397, 401, 93 Atl. 505. Since the installation of the machinery involved in this case is, on its face at least, incidental to such commerce, it would seem that, in order to determine whether or not we are here dealing with an isolated transaction we can only consider that part not thus incidental, which in this case could at most, if at all, consist of the erection of the rooms, and possibly the employment of local labor and purchase of local materials. That only, it would seem, could convert a contract for an interstate sale into one for construction in this state. Now an isolated transaction depends, at least partially, on how extensive it is, as may be noted from Interstate Construction Co. v. Lakeview Canal Co., supra. As will be stated hereafter, the information we have on that subject is too meager for us to decide that point. Nor is it necessary to determine the effect herein if the transaction was in fact an isolated one, and we shall proceed to consider the third test above mentioned.

The defendant contends that the transaction became interstate by reason of the fact that material and labor was furnished locally. It alleged in its answer, which was admitted in the reply, that "the plaintiff bought material and supplies in the city of Cheyenne, which

were used in the erection and construction of the said plant at the defendant's place of business in the city of Cheyenne." Whether the plaintiff bought little or much is not alleged. For aught that appears, it may have been but a trifle, and courts do not take cognizance of trifles. It further alleged, which was admitted in the reply, that it took a month for the plaintiff to install the machinery and to erect the hardening and anterooms; that "plaintiff did also furnish one erecting engineer from the State of Colorado and other help from the city of Cheyenne, necessary in the work of constructing and building said plant." The allegation does not inform us how long it took to erect the rooms and how long to install the machinery, or how much labor was used in the two operations separately, so that, for aught that appears herein, the erection of the rooms may have been but a small part of the whole work, not sufficient to convert a transaction on its face interstate to one which is intrastate. On this phase of the case the defendant cites us particularly to Palm-Vacuum Cleaner Co. v. Bjornstead, 136 Minn. 38, 161 N. W. 215; Bryan v. Bowser & Co. (Tex. Civ. App.) 209 S. W. 189, and National Refrigerator Co. v. Southwest Missouri Light Co., 288 Mo. 290, 231 S. W. 930. The first two of these cases, from which the defendant quotes, were decided before the decision in the York Manufacturing Company case, supra. They both decide, in substance, that an installation of machinery is on its face intrastate business. Neither of these cases can be held to be authority now. In the Missouri case cited, decided after the York Manufacturing Company case, the plaintiff furnished and installed an ice-making machine. The machinery in that case was bought from various manufacturers. The installation was extensive, requiring several months' time, and a great amount of labor and local material. The court substantially held that the transaction was one for

construction rather than one for sale. It is apparent that, so far as the record before us shows, we cannot compare this case with that. The mere fact that some local labor or material has been furnished in connection with the installation of property shipped in an interstate shipment, particularly in connection with the installation of complicated machinery does not, according to at least the weight of authority at the present time, convert an otherwise interstate transaction into one which is intrastate. General Fire Extinguisher Co. v. Auto Supply Co., 65 Mont. 371, 211 Pac. 308; Vilte Mfg. Co. v. Evans, 86 Ind. App. 144, 154 N. E. 677; United Iron Works Co. v. Hotel Company, 182 Ky. 113, 206 S. W. 113 (time taken 3 months); R. S. Webb v. Glass Co., 217 Ky. 225, 289 S. W. 360; Hess Warm. & Vent. Co. v. Grain Elevator Co., 280 Mo. 163, 183-184, 217 S. W. 493; Williams v. Golden & Crick, supra; J. B. Colt Co. v. McBurnett (Tex. Civ. App.) 1 S. W. (2d) 385; Southern Discount Co. v. Rose (Tex. Comm. App.) 296 S. W. 482. In the last cited case, the court stated:

"The agreement to supply materials and labor, whether from points within or without this state, for the purpose of installing the plant and thereby performing the obligations imposed under the terms of the contract, was relevant and appropriate to a transaction inherently interstate in character. The materials and labor supplied were essentially connected with the subject matter of the sale."

It remains, then, to consider as to whether or not the construction of the hardening and the anteroom must be said, upon the record before us, to have converted the transaction into one which was intrastate, or vitiated the whole transaction. Counsel for neither party introduced any evidence as to the nature or character of the "hardening room" and the "anteroom" agreed to be furnished by the plaintiff company, nor do we find any adequate explanation thereof in the briefs of

counsel. So we are compelled to rely upon what little is shown in the record, and upon the meager information which we have been able to obtain from scientific treatments. In 12 Ency. Brittanica, 14th ed., p. 40, in an article treating of "factory ice cream," it is stated that "sugar is placed in the mix in the standardizing room and the flavor is added to the mix at the freezer. The freezers or containers are placed in a hardening room, constructed of concrete and lined with cork. The temperature, controlled by a brine refrigerating system, ranges from 10 to 20 degrees below zero." Some information is contained in Miscellaneous publication No. 138 of the United States Department of Agriculture, March, 1932. On page 47, treating of the storage of butter, it is stated that "it is evident from the foregoing that in the successful manufacture of butter refrigeration is necessary in every step of the process and accurate control of temperatures is essential in the making of a high-grade product. In the modern creamery, refrigeration is employed in connection with the processes of pasteurization, ripening and churning, in the preparation of starters, in cooling water for washing the butter, and in cooling the storage room for the finished product. Frequently it is employed in cooling the raw material." On pages 54-55 it is stated: "Except in the case of the low temperature or quick hardening process, about half of the actual freezing of the ice cream takes place in the hardening room * * *. The partly frozen ice cream is therefore quickly transferred to the hardening room, where the temperature is lowered. * * * The consensus of opinion of ice-cream manufacturers is that the hardening room should be maintained at about minus 10° for best results. * * * The hardening rooms should be provided with ample insulation. There should be no hollow spaces in walls, floors or ceilings, for such spaces permit the collection of moisture and frost, and thus cause

weakening and deterioration of the structure. The structural walls should, therefore, be of solid construction such as brick or concrete. Practice seems to indicate that at least the equivalent of 8 inches of pure cork should be used in the floors of the hardening room." The contract in the case at bar provides for the sale and installation of "refrigeration equipment." On its face, it indicates that the rooms are a part thereof. From what has been stated above, it would seem that the hardening room is an essential part of a complete refrigeration system for a creamery, at least one which makes ice cream. The average temperature thereof was to be 10° below zero, and we take it that it requires skill to adjust the temperature as required. The rooms were to be furnished with considerable equipment, as above noted. We do not know how it was to be installed, and what connection the walls of the rooms would have therewith. It is not unlikely, so far as the record shows, that the manufacturer of the machinery above mentioned can furnish the rooms much more cheaply, and make them more perfect than anyone else. We cannot say from the record before us that, in order to make the system operative as a whole —which is the main criterion herein under the York Manufacturing Company case, supra—the construction of the hardening room was not a relevant part of the transaction in this case. The evidence in a retrial of the case may present a different state of facts. The point is not so clear as to the anteroom. We cannot tell what it is. Counsel for the defendant calls it a cooling room, and places it on the same footing with the hardening room. Provision was made for its average temperature; it was to be equipped along with the hardening room, and we are not able to say that it presents a question different from that relating to the latter. In the case of R. S. Webb, Jr. v. Knoxville Glass Company, 217 Ky. 225, 289 S. W. 360, the Knoxville

Company, not domesticated in Kentucky, agreed to furnish and put in plate glass in front of defendant's garage in Kentucky. It "sent its material and men to Kentucky, and they and others working for them in two weeks built a concrete foundation for the glass to rest on, and then put in the glass." The purchaser himself, doubtless, could have put in the concrete foundation. Nevertheless, the court held that this was but incidental to the interstate commerce shipment. We cannot say under the facts before us that the construction of the hardening and anteroom was not just as much appropriate and relevant to the installation of the refrigeration in this case as was the construction of the foundation in the Kentucky case. We might in this connection refer to the seemingly most recent case involving an interstate shipment and installation, namely, Weber Showcase & Fixture Co. v. Co-ed Shop, 47 Ariz. 415, 56 Pac. (2d) 667, decided in 1936, in which the plaintiff agreed to sell and install certain office-fixtures. The court held the installation to be incidental to the sale, stating in part: "Goods of the character in question are almost invariably shipped knocked down, and require assembly and installation before they are of the slightest use to the purchaser. This work can be done far better, more expeditiously, and cheaper by the agents and employees of the manufacturer than it can possibly be done by workmen who are not perfectly familiar with the goods. We think that in contracts of this nature, an agreement to assemble and install the fixtures is a 'relevant and appropriate part of the sale.' "

We have stated that the contract provides that "any part of this agreement contrary to the laws of the state in which it is written or executed or to be enforced shall not invalidate other parts of this agreement." We are not called upon to decide what bearing, if any, that agreement has upon the transaction herein,

if it should be found that the construction of the rooms was not incidental to interstate commerce, since the point has not been argued. See Smilansky v. Mandel Bros., 254 Mich. 575, 236 N. W. 866, cited by counsel for the plaintiff, but seemingly not quite understood.

The judgment of the trial court is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

RINER, Ch. J., and KIMBALL, J., concur.