INDIANA DEPARTMENT OF STATE REVENUE, GROSS INCOME TAX DIVISION, ETC., ET AL. *v.* SURFACE COMBUSTION CORPORATION.

[Nos. 28,834 and 28,835 consolidated. Filed March 19, 1953. Rehearing denied April 21, 1953. Certiorari denied U. S. Supreme Court October 12, 1953.]

102

*J. Emmett McManamon,* former Attorney General, and *Edwin K. Steers, Jr.,* Attorney General, *John J. McShane, Lloyd C. Hutchinson, Joseph E. Nowak, Robert F. Wallace, Earl E. Schmadal* and *George B.*

*Hall,* Deputy Attorneys General, all of Indianapolis, for appellant.

*Arthur L. Gilliom, Robert D. Armstrong, Elbert R. Gilliom* and *Richard L. Gilliom,* all of Indianapolis, for appellee.

BOBBITT, J.—These cases were consolidated for briefing and oral argument and are so treated in this opinion.

Whenever appellee is referred to herein it shall mean the appellee and it predecessors in interest, or whichever of them is appropriate under the circumstances.

The action in No. 28,834 was commenced in 1944 by the filing of a complaint in three paragraphs by appellee's predecessors in interest, under the provisions of Acts of 1933, ch. 50, §14, p. 388, as amended, being §64-2614, Burns' 1951 Replacement, to recover the sum of $14,503.79 as gross income tax, and $6,315.57 as interest, which it is alleged was improperly collected for the tax years of 1934 to 1941, inclusive, and to recover interest on the total amount at three per cent per annum from the date of the alleged improper collection.

Paragraph 1 of the complaint presents the question whether the tax collected was a tax on interstate commerce in violation of the commerce clause, par. 3 of §8 of Art. 1 of the Constitution of the United States.

The action in No. 28,835 was commenced in 1948 by the filing of a complaint in five paragraphs by appellee to recover the sum of $55,380.53 as gross income tax, and $4,030.11 as interest, which it is alleged was improperly collected for the tax years 1942 to 1945, inclusive, and to recover interest at the rate of three per cent per annum on the total amount from the date of the alleged improper collection.

Except for the tax years and amounts involved, paragraph one in this case presents the same question as does paragraph one in the other case.

Among the errors assigned are:

1. The court erred in granting appellee's request for special findings of fact and conclusions of law, which request was untimely filed, to-wit: after submission of the cause.

2. The court erred in overruling appellants' objections and exceptions to the findings of fact, specifically designated in specifications one to sixteen, all inclusive, and conclusions of law, specifically numbered one to eight, all inclusive.

3. The court erred in overruling the appellants' motion to vacate its special findings of fact and conclusions of law, and to enter special findings of fact and conclusions of law according to and in compliance with the evidence adduced, produced and introduced at the trial of the cause.

6. The court erred in its conclusion of law numbered one.

7. The court erred in its conclusion of law numbered two.

8. The court erred in its conclusion of law numbered three.

10. The court erred in overruling appellants' motion for a new trial . . . Among the grounds alleged in said motion are (1) the decision of the court is not sustained by sufficient evidence, (2) the decision of the court is contrary to law, and (3) the decision of the court as it relates to the special findings of fact and each specification thereof, is not sustained by sufficient evidence.

*First:* Before considering the main issue involved it is necessary to dispose of the independently assigned errors one, two and three.

1. If appellee's request for special findings of fact and conclusions of law was made after the commencement of the trial, the granting of the request ■ was within the sound discretion of the court. Flanagan, Wiltrout and Hamilton Ind. Tr. & App. Pract., §1732(1), p. 351.

An abuse of discretion under the circumstances here would be ground for a new trial and hence assignment numbered one, as an independent assignment of ■ error, presents no question in this court. *Noblesville, etc. Assn.* v. *Capital Furn. Mfg. Co.* (1914), 57 Ind. App. 368, 370, 107 N. E. 85, and cases there cited.

2. Assignment numbered two is addressed to objections and exceptions to findings of fact. Motions to modify, strike out, or add to special findings of fact are not recognized by our code of procedure. *Chicago, etc., R. Co.* v. *State ex rel.* (1902), 159 Ind. 237, 241, 64 N. E. 860, and authorities there cited.

See also: *Beach.* v. *Franklin Township* (1914), 56 Ind. App. 220, 225, 103 N. E. 498; Lowe's Revision, Vol. 3, §53.31, p. 309; Flanagan, Wiltrout and Hamilton Ind. Tr. & App. Pract., §1732(7), p. 354.

Appellants' objections and exceptions fall within the same class of pleadings as motions to modify, ■ strike out, or add to special findings and present no question in this court.

3. The error alleged in specification three must be reached by a motion for a new trial on the ground that the finding is contrary to law. Lowe's Revision, Vol. 3, §53.30, pp. 307, 308.

*Second:* Appellee contends that appellants have

failed to discuss or adequately state in their brief the basis of the objections to the rulings complained of in assignments numbered ten, eleven and twelve, including the causes relied upon for a new trial. An examination of appellants' brief leads us to the conclusion that it is sufficient to constitute a substantial compliance with Rule 2-17(e), (f) of this court. However, an examination of the recital of the evidence in appellants' brief convinces us that the evidence was sufficient to sustain the special findings of fact in both cases. Hence, it is immaterial whether or not appellants have waived the questions raised by their assignments numbered ten, eleven and twelve.

*Third:* In view of the conclusion which we have reached we need consider only the question raised by paragraph one of the complaint—assignment of error numbered six.

In considering alleged error in a conclusion of law based upon special findings of fact, we accept such facts as correctly found. *Hutchens, Admr.* v. *Hutchens* (1950), 120 Ind. App. 192, 198, 91 N. E. 2d 182; *Kerfoot* v. *Kessener* (1949), 227 Ind. 58, 73, 84 N. E. 2d 190.

A summary of the facts relative to conclusion of law numbered one as specially found by the court discloses the following:

Appellee is a corporation organized and existing under the laws of the State of Ohio with its principal office, place of business, warehouse and manufacturing plant in the city of Toledo, Ohio. Neither appellee nor its predecessors in interest had, at any time mentioned herein, any manufacturing plant or warehouse in the state of Indiana, or any officer, agent or solicitor in this state who was authorized to enter into contracts. All manufacturing and fabricating operations herein mentioned were carried on by appellee and

its predecessors in interest in the city of Toledo, Ohio. When appellee ascertained that a potential customer in Indiana was interested in securing one or more furnaces it made a study of the needs of the customer and selected a type of furnace adaptable to those needs. Appellee then prepared and submitted to the customer in Indiana, from its Toledo office, in duplicate, a "proposal and specifications." Such proposal and specifications expressly provided that it should become a contract binding upon the company only when approved in writing by an executive officer of the company at its office in Toledo. The proposal when signed by the customer in Indiana was returned to appellee at its Toledo office for acceptance and approval. All invoices were prepared at appellee's Toledo office from which they were transmitted to the customer, and all payments on the purchase price were made to it at its Toledo office.

At the time each of the contracts between the appellee and the customer was entered into, said parties contemplated and intended that the furnace covered thereby should be shipped and transported from appellee's plant at Toledo, Ohio, to the customer's plant in Indiana, and the contracts provided for such shipment by appellee directly to the customer f.o.b. cars at the point of shipment. The customer provided a concrete foundation for the furnaces, conduits through which gas pipes, water pipes and electric wiring were connected to the furnaces, and unloaded and transported the furnace to his plant at his expense. Smaller furnaces were completely assembled at appellee's plant in Toledo and were so transported to the plant of the customer. The larger furnaces, because of their size and weight, could not be shipped completely assembled. These were either "knocked down" or partially assembled at appellee's factory in Toledo, and reassembled or completely assembled at the customer's plant in Indiana.

The contract further provided for a lump sum price to be paid by the Indiana customer and a schedule for the payment of the purchase price, with the final payment to be made on or after the complete assembly and adjustment of the furnace

in the customer's plant. The title to the furnace and equipment remained in appellee until the purchase price was fully paid.

All of the furnaces, including large and small, contained intricate machinery and mechanism which required specially trained factory engineers, supervisors and workmen to assemble, where required, and to install, align and adjust all of them at the customer's plant in order to assure a proper functioning furnace which was necessary to consummate and complete the sale.

Each of the furnaces was designed and adapted for the particular use of the customer at the time of their installation, but were such as were used in the trade generally and could be moved from one location to another by making slight changes and adjustments therein, i.e., by varying the temperature, cycle and other details.

The trial court specially found that all of the furnaces here involved were machines performing a manufacturing function in industry and "were and at all times remained chattel personal property"; and the performance of each of said contracts by the customer was a purchase of chattel personal property for a purchase price, and the performance of each of said contracts by the company was a sale of chattel personal property for a purchase price.

Appellants contend that all of the income of appellee here involved was derived from the erection and installation in Indiana of one of its manufactured products; that the sources of the gross receipts upon which the tax here in question was levied were indivisible installment contracts for the fabrication, erection and installation of heat treating furnaces "within the respective plants of customers in Indiana"; and that no part of such income could have been derived from an activity connected with interstate commerce.

Appellee contends that all of said receipts were derived from the sale of personal property in interstate commerce and that the taxes herein, and each

part thereof, were, and are, an unreasonable burden on interstate commerce in violation of Art. 1, §8 of the Constitution of the United States.

The first question thus presented is:

Are the receipts here in question derived from the performance of contracts within the State of Indiana, or from sales of personal chattels in interstate commerce?

To sustain their position appellants rely upon the following authorities:

(1) *Stone* v. *York Ice Machinery Corporation* (1942), 193 Miss. 638, 10 So. 2d 380, involved the question of whether or not the local activity of a nonresident, performed in the installation, adjustment, and testing of certain air-conditioning systems in buildings located in the State of Mississippi and constituting a substantial part of the performance of contracts for the sale of machinery and equipment, which was manufactured outside of the state and shipped there in interstate commerce for use in air-conditioning such buildings, was subject to a privilege tax and a sales tax respectively for the right to engage in such activities in the state of Mississippi. The tax there was sustained on the theory that it was imposed upon the privilege of engaging in the business of contracting within the state, and that as such it did not discriminate against interstate commerce.

The contract in the York case not only provided for adjusting and testing but the installation of a complete air-conditioning system in two hotels in Jackson, Mississippi, and a meat curing plant at Natchez. It required five months to complete the installation of one, three months for the other, and three months for the meat curing plant.

The purchasers in Mississippi did not contract for a completely fabricated air-conditioning system or meat curing plant to be shipped, as such, from the factory of York Ice Machinery Corporation, but the primary consideration of the contract was the building and installing of air-conditioning systems in the hotels, the construction of a meat curing plant, and the furnishing of the necessary labor, equipment, and materials therefor. The air-conditioning systems were built into and became a part of the buildings in which they were installed. They were not standard machines which could be removed, resold and used by other customers of the trade with only minor adjustments as were the furnaces in the case at bar. The facts in that case fall within the rule in *Browning* v. *Waycross* (1914), 233 U. S. 16, 58 L. Ed. 828, 34 S. Ct. 578, which involved the violation of a city ordinance that imposed an occupation tax of $25 per year upon lightning rod agents or dealers engaged in "putting up or erecting" lightning rods within the city limits, as constituting a local activity for which a license fee or privilege tax was imposed, and the facts there were of such a nature as to fall within this class of activities so as to fall within the ordinance there applied.

No such situation exists in the case at bar and the rule applied in the York Ice Machinery Corporation case has no application to the facts now before us.

(2) *M. K. Smith Corporation* v. *Ellis* (1926), 257 Mass. 269, 153 N. E. 548, was an action to recover the cost of the construction of a cider tank. The court there held that the agreement was for the building of a specific article and was a contract for labor and materials. In this case a specific article was manufactured by the seller especially for the buyer, and it was not suitable for sale to others in the ordinary course

of seller's business. The facts in the case at bar are to the contrary. The trial court found, and the evidence supports such finding, that the furnaces here in question were such as were used in the trade generally and might be resold to other customers in the ordinary course of appellee's business. That case is clearly distinguished from the case at bar, and does not apply to the facts here before us.

(3) *Western Gas Const. Co.* v. *Commonwealth* (1927), 147 Va. 235, 136 S. E. 646, 55 A. L. R. 717 (Affirmed, 276 U. S. 597, 72 L. Ed. 723, 48 S. Ct. 319). While the facts in this case may have some similarity to those in the case at bar, they differ in the essential elements. The Western Gas Construction Company was an Indiana corporation which, without having taken out a license to do business in Virginia, entered into contracts for the "sale, assembling, installation and erection of certain gas machines and equipment in the city of Richmond and in the city of Winchester, [Virginia]." The equipment was manufactured and assembled, as far as practicable, at Ft. Wayne, Indiana, and the balance of each contract was performed in the city of Richmond and Winchester, respectively. The work was supervised by an expert with three assistants from the home office of the Western Gas Construction Company and was commenced in July of 1925 and was to be completed by November 1st. The installation did not require expert supervision, as it would have been possible for the installation to have been done and the work performed according to blueprints and specifications by experts other than those of the manufacturing company. The court there held that the activities were construction contracts and the use of personal property in their fulfillment was a mere incident. At page 651, 136 S. E., the court said:

"First of all, there must have been a sale of personal property, which had to be transported in interstate commerce, and, if this was shown, then the seller had the right to set it up, or install it. But in the instant case, looking to the record as a whole, the contract was not for the sale of specific, definite personal property, simply to be transported, and then set up, or installed in place, but a contract to furnish the materials and build an addition to the gas plant of the city of Richmond, according to designated plans and specifications, and to connect it up with the existing plant and other machinery being contemporarily installed."

In the case at bar the installation of the small furnaces involved only their being placed upon the foundation which had been prepared by the customer, the connection of electric wires and gas pipes, and the adjustment of the furnace. The only additional service required in connection with the larger furnaces was the reassembling of them at the plant of the customer before they were installed on the foundations. This, in our opinion, is clearly not a contract such as that involved in the Western Gas Construction Company case.

(4) *Dravo Contracting Co.* v. *James* (1940), 114 F. 2d 242, 147 A. L. R. 135, (Cert. denied 61 S. Ct. 450, 312 U. S. 678, 85 L. Ed. 1117), involved a statute of West Virginia which levied privilege taxes, on account of the business and other activities of every person engaged in West Virginia in the business of contracting, equal to two per cent of the gross income of the business. Appellee was a Pennsylvania corporation with its office and plant near Pittsburgh, and held contracts with the United States Government for the construction of locks and dams in the Ohio and Kanawha rivers in the state of West Virginia. It was contended by the revenue commissioner that the entire income received

from the contracts, with the exception of the partial payments made on account of the delivery or fabrication of material at the Pittsburgh plant, was income received as the result of activities taking place in the state of West Virginia. The court, at page 245, 114 F. 2d, said:

> " 'It is clear that West Virginia had no jurisdiction to lay a tax upon respondent with respect to this work done in Pennsylvania. . . .'
>
> . . . .
>
> "We agree with taxpayer that the court was without power to apportion its income on the basis of the cost of the activities involved in earning the income within and without the state. No such basis of apportionment is prescribed by statute; and, in the absence of statute, the court is without power to adopt it, as this is a legislative function involved in the imposition of the tax, and, therefore, not one which courts may exercise. [Citing authorities] In cases where the tax imposed is not in its nature divisible and some part thereof is beyond the taxing power of the state and no provision is made for apportionment, the whole tax is void. [Citing authorities]."

The court there held that the tax was laid upon the business of contracting conducted in West Virginia, and that income derived from that business was properly subject to taxation by that state. It is clear that the contracts involved in the case at bar have no similarity to those of the contracts for locks and dams in the Dravo Contracting Co. case.

There is a vast difference between a contract to furnish the necessary machinery and material therefor and construct locks and dams in rivers within a state, and a contract to furnish heat treating furnaces constructed and fabricated at the company's factory and shipped f.o.b. the point of shipment, with nothing to be done in the state to which they

were shipped except, in the case of the small furnaces, to fasten them on the base prepared by the customer, and adjust them to a satisfactory working condition, and to reassemble the large furnaces where required.

There, again, the tax was imposed upon the taxpayer for the privilege of engaging in the business of contracting within the state. Courts have repeatedly held that a tax of this nature does not violate the commerce clause of the Constitution.

(5) *James* v. *Dravo Contracting Co.* (1937), 302 U. S. 134, 82 L. Ed. 155, 58 S. Ct., 208, 114 A. L. R. 318, involving the same parties as *Dravo Contracting Co.* v. *James, supra,* not only does not support appellants' position but is contra to their contention that the work performed by appellee in the instant case must be considered as a local activity performed within the State of Indiana. Chief Justice Hughes, speaking for the court, at page 160, 82 L. Ed., said: "Unless the activities which are the subject of the tax were carried on within the territorial limits of West Virginia, the State had no jurisdiction to impose the tax." In the James case the company purchased outside the State of West Virginia materials used in the manufacture of roller gates, lock gates, and other mechanism and equipment under each of its contracts, and fabricated them at its plant in Pittsburgh. Certain of the equipment was preassembled at the company's shops at Pittsburgh and there stored until time for delivery, when it was transported by the company to the designated sites in West Virginia and there installed. The contracts, as in the case at bar, provided for partial payments as the work progressed. Payments were made by the government from time to time according to the provisions of the contract.

The court, at page 161, 82 L. Ed., further said:

"It is clear that West Virginia had no jurisdiction to lay a tax upon respondent with respect to this work done in Pennsylvania. As to the material and equipment there fabricated, the business and activities of respondent in West Virginia consisted of the installation at the respective sites within that State and an apportionment would in any event be necessary to limit the tax accordingly."

The court held that the company's activities consisting of construction work at the dam sites were local and not in interstate commerce. The work required in the construction of locks and dams in a river is clearly distinguishable from that required in the installation of a heat treating furnace or other fabricated machines, and the fact that the construction of locks and dams in the James case was held to constitute the performance of local activities in the State of West Virginia is not authority for holding that the installation of the furnaces, under the circumstances in the case at bar, was a local activity performed in the State of Indiana.

(6) *Gross Income Tax Div.* v. *Ft. Pitt Bridge Wks.* (1949), 227 Ind. 538, 86 N. E. 2d 685, 87 N. E. 2d 721, involved the construction of a building for Youngstown Sheet & Tube Company in Indiana Harbor for which Ft. Pitt Bridge Works furnished and fabricated the steel in its plants in Ohio and Pennsylvania, from which it was shipped to Indiana Harbor. The Hunter Construction Co. and Ft. Pitt Bridge Works collaborated in submitting a bid to furnish, fabricate and erect the steel necessary for the new buildings at Indiana Harbor and erect the same. The bid was submitted in the name of Ft. Pitt Bridge Works. This court there correctly held that this was a contract to furnish material and erect buildings in Indiana. It was clearly a contract for the performance of a local

activity within the State of Indiana. The facts in the Ft. Pitt case are materially different from those in the case at bar, and that case is clearly distinguished from the one now before us and lends no support to appellants' position.

(7) *Holland Furnace Co.* v. *Department of Treasury* (1943), 133 F. 2d 212, (cert. denied 320 U. S. 746, 88 L. Ed. 443, 64 S. Ct. 49) covered three different suits, separately brought. One of these involved the Holland Furnace Company with its principal place of business and manufacturing plant at Holland, Michigan. It was duly qualified to do business in Indiana and maintained sales offices at various cities within the state where its employees, as agents, solicited written contracts. These contracts provided that Holland Furnace Company furnish and install at the customer's premises a particular *heating system* for a stipulated amount, payable at Holland's office in Michigan, Holland retaining the title until the contract was paid in full. A specified portion of the price was in payment of the cost of installation, registers, regulators and fittings.

The second suit involved Interstate Roofing and Supply Company, an Illinois corporation, with its principal place of business at Chicago. It also was qualified to do business in Indiana but maintained no place of business within the state, obtaining its business through salesmen from Illinois who solicited contracts from the owners of buildings in Indiana requiring asphalt or composition shingles to be applied to roofs and sides of houses. The shingles were purchased by Interstate from jobbers outside of Indiana and transported to its customers in Indiana. The purchase price was paid in Illinois. The shingles could be applied by any experienced workman but were put on the buildings by Interstate trained employees.

The other suit involved Great Lakes Dredge & Dock Company and Fitz Simons & Connell Dredge & Dock Company, New Jersey and Illinois corporations, respectively, with their principal place of business at Chicago, Illinois. Both were qualified to do business in Indiana and the contracts in question called for the construction of breakwaters, lighthouses, mooring piles and other work, and the furnishing of materials in connection therewith.

The Circuit Court of Appeals, Seventh Circuit, held that the tax arose "from the delivery and installation in Indiana by Holland and Interstate of furnaces, equipment, and shingles to customers in that state, and from work performed and materials furnished by Great Lakes and Fitz Simons at construction sites in Indiana, in performance of which, the appellants engaged in a local business, exactly as any other contractors, without discrimination against them in favor of purely local trade."

These cases are all clearly distinguished from the case at bar. In the Holland case, the contract was for the installation of heating systems in buildings already constructed or in the course of construction and the work included, not only the installation of a furnace, but of pipes, ducts, registers, vents and other materials necessary to the system. The installation here could have been done by any workman familiar with this type of work. The contract in the Holland case was clearly one for the installation of a heating system, including the placing of the furnace and the furnishing and installation of other equipment and materials necessary to constitute a complete heating system for the building. The customers of the Holland Furnace Company were not, as were the customers in the case at bar, buying a completely fabricated and assembled

heating system. The furnace, ducts, pipes, vents and other materials which became a part of the heating system when installed in the building, and the work of installation did not require the services of a specially trained factory supervisor. The Holland case is further distinguished from the one at bar by the fact that Holland maintained several places of business within the state of Indiana and was actively engaged in doing business within the state while such is not the case with appellee herein.

The Interstate contract was clearly one to furnish labor and materials and perform the work necessary to apply shingles to buildings located in Indiana. The primary purpose of the contract was not the purchase of shingles, but the covering of the house—a new roof or siding, and the shingles were incidental to the main purpose of the contract. The work could have been done by any carpenter. That situation differs materially from that of the installation of furnaces in the case at bar. .

The Dredge & Dock Company contracts were clearly contracts for construction and the furnishing of materials in connection therewith. The fact that the various activities covered in the Holland Furnace case were held to be subject to the Indiana Gross Income tax, because of the material difference in the type of contracts and the ultimate purpose to be accomplished by each, is not authority for the levying of such a tax on the activities involved in the case at bar.

The principles which we believe are applicable here are set forth in the following cases which although they did not involve the taxing power of the state, they did consider whether certain transactions were sales in interstate commerce or the performance of service contracts within the state. The facts in these cases are

strikingly similar to those in the case at bar, and these authorities are persuasive, if not controlling, on the question of whether appellee's activities were sales in interstate commerce, or the performance of contracts within the state of Indiana.

(1) The leading case on this subject is *York Mfg. Co.* v. *Colley* (1918), 247 U. S. 21, 62 L. ed. 963, 38 S. Ct. 430, 11 A. L. R. 611. This was a suit to collect an amount due upon a contract for the purchase of ice manufacturing machinery, and the principal question was whether the company was doing business within the State of Texas. Appellee alleged that appellant was a foreign corporation which maintained an office and transacted business in the state of Texas without having obtained a permit therefor. Appellant contended that its activities were in interstate commerce. The contract in question was for the delivery and installation of an ice plant consisting of gas compression pumps, compressor, condensers, freezing tanks, coils and other accessories, including apparatus for making distilled water. The machines were shipped to the point of delivery in Texas, "knocked down" or disassembled, and they were re-assembled and installed at the place of delivery under the supervision of an engineer furnished by appellant. Local labor furnished by the purchaser was employed to assist the supervising engineer and machines were not only to be erected and assembled at the place of delivery, but they were to be given a practical test in operation before the purchaser was obligated to accept the machine.

At page 965, 62 L. Ed., the Supreme Court said:

"As, in the second place, since the ruling in M'Culloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, there has been no doubt that the interstate commerce power embraced that which is relevant

or reasonably appropriate to the power granted, so also from such doctrine there can be no doubt that the right to make an interstate commerce contract includes in its very terms the right to incorporate into such contract provisions which are relevant and appropriate to the contract made. The only possible question open, therefore, is, Was the particular provision of the contract for the service of an engineer to assemble and erect the machinery in question at the point of destination and to practically test its efficiency before complete delivery relevant and appropriate to the interstate sale of the machinery? When the controversy is thus brought in last analysis to this issue there would seem to be no room for any but an affirmative answer. Generically this must be unless it can be said that an agreement to direct the assembling and supervision of machinery whose intrinsic value largely depends upon its being united and made operative as a whole is not appropriate to its sale. The consequence of such a ruling, if made in this case, would be particularly emphasized by a consideration of the functions of the machinery composing the plant which was sold, of its complexity, of the necessity of its aggregation and unison with mechanical skill and precision in order that the result of the contract of sale—the ice plant purchased—might come into existence."

And further, at page 966,

". . . that which is intrinsically interstate and immediately and inherently connected with interstate commerce is entitled to the protection of the Constitution of the United States resulting from that relation."

(2) *Palmer* v. *Aeolian Co.* (1931), 46 F. 2d 746, (cert. denied 283 U. S. 851, 75 L. Ed. 1458, 51 S. Ct. 560), involved a contract requiring a foreign corporation to build, deliver, and install an organ according to plans and specifications which were made a part of the contract. The contract also provided for the delivery of the organ f.o.b. railroad cars at the point of ship-

ment, and the title to the organ remained in the seller until full payment of the purchase price had been made.

Appellant contended that the contract did not constitute a sale in interstate commerce but the principal and essential thing contracted for was the installation of the organ in the theatre in Iowa, and that the installation was not such a part of the delivery of the organ as to be embraced within an interstate sale. Upon this question the Circuit Court of Appeals, Eighth Circuit, at page 752, 46 F. 2d, said:

> "The findings do not show that the organ could have been assembled or installed by any others than employees of the defendant the Aeolian Company. It seems obvious that the value of such an organ would depend upon its being so installed that the purpose of the sale would be made effective. It would also seem to be obvious that in the case of such an instrument, which was to accomplish not only a mechanical result, but also an artistic success, that particular emphasis must be given, as the Supreme Court said was required in considering the contract for the sale of the ice machine, to a consideration of the functions of the organ machinery, of its complexity, of the necessity of its aggregation and unison with mechanical skill and precision in order that the result of the sale might come into existence. . . .

> "A full consideration of the facts shown by the pleadings and findings in this case leads to the conclusion that the making of the contract in question was so much an appropriate part of a sale of goods in interstate commerce that the statutes of Iowa which have been cited were not applicable and that the corporation legally executed the contract."

(3)    *Aeolian Co.* v. *Fischer* (1930), 40 F. 2d 189, involved a similar question as that in *Palmer* v. *Aeolian Co.*, *supra*. At page 190, 40 F. 2d, the Circuit Court

of Appeals, Second Circuit, quoting the District Judge said:

> " 'The agreement of the organ manufacturer to install is not only relevant and appropriate to the interstate sale but is essential if an organ, as distinguished from its parts, may be sold at all. The thing sold is a musical instrument, complete in itself. . . . Without descending to mechanical description it may be said that the work of installation is of the most vital importance in the construction of the completed organ, and requires in its performance not only the highest mechanical skill but a thorough understanding of methods employed by the manufacturer in the arrangement of mechanical and electrical connections . . . Whatever distinctions may be drawn in doubtful cases, it is clear that the instant case is governed and controlled by the decision in the ice machine case (York Mfg. Co. v. Colley, 247 U. S. 21, 38 S. Ct. 430, 62 L. Ed. 963, 11 A. L. R. 611). The distinction there drawn between the setting up of lightning rods (Browning v. Waycross, 233 U. S. 16, 34 C. Ct. 578, 58 L. Ed. 828) and the installation of an ice machine shows that the contracts here in question for the construction and installation of organs clearly involve interstate commerce not only in the manufacture and shipment of the organ, but in its installation after arrival within the state.'   .

"With this conclusion we agree."

(4) The Supreme Court of Missouri had before it in *Hess Warming & Ventilating Co.* v. *Burlington Grain E. Co.* (1919), 280 Mo. 163, 217 S. W. 493, the question whether a contract, similar to the one presently under consideration herein, resulted in a local activity in the state of Missouri or a transaction in interstate commerce. The contract there provided that the company in Chicago, Illinois, furnish, deliver and erect for the Grain Co. in St. Louis, Missouri, one No. 8 Hess pneumatic drier and cooler and make the same ready for all connections with power, steam, conveyors, etc., which

connections were to be provided by the Grain Co. (purchaser).

The Hess Company had its office and principal place of business in Chicago. It was not licensed to do business in Missouri and had never maintained an office or place of business in that state.

The contract was prepared in the office of Hess Company at Chicago and after it was signed for Hess Company, by its president, it was sent to the Grain Company in St. Louis for its signature. The materials for the drier were made and prepared in Chicago and shipped by rail to St. Louis. An expert from the factory in Chicago was sent to St. Louis where he hired men to assist in the installation of the machine, under his supervision. The drier consisted of grain racks, fans, and steam coils, resting upon steel beams in the drier building. These various parts were placed in position and bolted together by the local labor under the supervision of the factory supervisor. The court there held that the Hess Co. had a right under the commerce clause of the federal Constitution to send its skilled supervisor into the state, at the expense of the Grain Company and erect and install the grain drier, and instruct the purchaser in the manner of its use without taking out a license to do business in the state of Missouri.

(5) The Supreme Court of Kansas had before it a similar factual situation in *Kaw Boiler Works Co.* v. *Interstate Refineries* (1925), 118 Kan. 693, 236 P. 654. Appellant was a Kansas corporation with its principal place of business in Kansas City, Kansas. Certain contracts were entered into whereby appellant furnished to appellee the equipment for the erection of an oil-cracking refinery at its plant in Kansas City, Missouri. Appellee contended that the contracts were made in Missouri and that at least a part of the work was

performed there and, therefore, appellant was subject to the license statute. Appellant contended that the contracts were made in Kansas, the equipment was fabricated in Kansas, that some of the equipment was too bulky to be shipped set up, and that only the erection thereof was done in Missouri, and that this was but an incident to a valid interstate transaction and, as such, was not subject to the Missouri statute.

The court at page 656, 236 P., said:

"The apparatus was fabricated and assembled into a finished product in Kansas. As to the pressure stills, there remained the act of the attachment of the coke pots to the stills. The only thing that prevented the attachment in Kansas, and which required the attachment to take place in Missouri, instead of Kansas, was the operation of the Interstate Commerce Commission rules. The inspection and acceptance occurred in Kansas. So far as the tanks were concerned, the entire fabrication occurred in Kansas. The completed tank was temporarily set up to insure that the forms of assembled plates were properly united and would form a perfect whole. They were then taken down, and the plates, comprising five carloads, were loaded upon cars in Kansas and shipped to Missouri—so shipped because of their dimensions and the Interstate Commerce Commission rule. The defendant prepared the foundations in Missouri, received and unloaded the interstate shipment, and hauled it to the place of assembling. The plaintiff sent its experts and trained workmen from its Kansas plant to Missouri to assemble the parts. All tools used in such work were taken from plaintiff's plant and returned when the work was done.

"The question turns upon the proposition of whether or not the things necessarily done in Missouri to complete the plant or the integral parts thereof under the contracts were incident to interstate commerce, so as to constitute a constituent part of an interstate transaction.",

and the court so held.

(6)   The Appellate Court of Indiana had under consideration a similar question in *Vilter Mfg. Co.* v. *Evans, Rec.* (1927), 86 Ind. App. 144, 154 N. E. 677, where appellant was a corporation organized under the laws of the State of Wisconsin and had not qualified to do business in Indiana. This company executed a contract with the Fort Wayne Dairy Company, Incorporated, for the sale of an ammonia compressor and other machinery and apparatus. The action there was to recover the unpaid balance of the purchase price. The compressor was fabricated in Milwaukee, Wisconsin, where, on account of its size and weight, it was disassembled and shipped "knocked down" to the Dairy at Fort Wayne. It was necessary and essential for appellant to furnish a skilled engineer to supervise the erection, installation, testing and starting of the machinery which consisted of many pieces of large, heavy and extremely intricate machinery, and in order to install the same it was necessary to hire local common laborers to work a total of 1,419 hours during a period of seven weeks. No part of the machinery was purchased in Fort Wayne, nor was any work done thereon by local laborers other than the assembly of parts. The question there determined by the court was whether or not the contract of sale of the refrigerating plant in question and its erection and installation by appellant at the Dairy's plant in Fort Wayne constituted interstate commerce, or the doing of business within the state of Indiana. At page 147, of 86 Ind. App., the court said:

"This work [the equipment of a manufacturing plant with a sprinkler system] required the employment of labor for weeks in such construction, required the building of a tower, a tank, and other carpenter work, and the excavating and filling of trenches, with the use of material which was on

the ground of, and the property of, the manufacturing company, while, in the contract here involved, there was a simple sale of an ammonia compressor, and machinery and apparatus appurtenant thereto, with an agreement to install the same. It appears by the averments of the complaint that, because of the great weight and size of the compressor and its appurtenant machinery, it was necessary to take it to pieces and then to reassemble it at the point of destination; that the machinery involved consisted of many pieces of large, heavy, and extremely intricate machinery, and that the services of a skilled erecting engineer were required to supervise the erection, installation, testing and starting of such machinery. It is admitted by appellee that the services of this engineer were within the compass of the interstate sale, but he contends that the employment of local laborers to assist in the erection and installation of the machinery was doing a local business, not inherently and intrinsically a part of the interstate contract, but that such employment was essentially intrastate in its character. But these local laborers were employed only in the reassembling and installing of a refrigerating plant which had been purchased in its entirety in the State of Wisconsin and taken to pieces for the convenience of shipment. All of the work done was involved in the sale, . . . "

Where it was necessary for appellee herein to ship furnaces partly "knocked down" because they were too large to be transported on a railroad car or truck, when completely assembled, the work of assembling or installing them at the plant of the customer was as much an inherent and essential part of the contract for the sale of a complete and functioning furnace as was the erection and assembling of the compressors in the *Vilter Mfg. Co.* v. *Evans, Rec., supra,* case.

The assembling of these furnaces required specially trained persons possessing a mechanical knowledge of

the furnace and a thorough understanding of the methods and manner of assembly employed by the manufacturer. This was work which the appellee was required to do in order to make and complete the sale of the larger furnaces, and is not work performed under a local contract, but is intrinsically related to and inherently a part of the sale.

The agreement of appellee to install furnaces which were shipped completely assembled and to assemble and install those which were shipped in sections—"knocked down"— is not only related to the sale of such furnaces, and a necessary incident thereto, but is essential if the furnaces are to be sold. The thing which the customer in Indiana purchased from appellee in Toledo, Ohio, was a heat treating furnace complete in one functional unit. The "knocked down" and unassembled sections of the large furnaces which were shipped from appellee's factory in Toledo were not the subject matter of the sale—the customer did not buy the parts of a furnace and contract with appellee to construct and install a furnace with parts which had been individually purchased. The sales here involved were not completed until the furnaces were reassembled and adjusted at the purchaser's plant so they would perform the functions for which they were purchased.

As was said by the Indiana Appellate Court in *Vilter Mfg. Co.* v. *Evans, Rec.* (1927), 86 Ind. App. 144, 154 N. E. 677, *supra,* concerning the ammonia compressor, the local laborers were employed by appellee herein only in the reassembling and installing of the furnaces which had been purchased in the State of Ohio and taken apart for the convenience of shipment.

There is a clear line of distinction between those cases which follow *Browning* v. *Waycross* (1914), 233

U. S. 16, 58 L. Ed. 828, 34 S. Ct. 578, *supra*, and those which follow *York Mfg. Co.* v. *Colley* (1918), 247 U. S. 21, 62 L. Ed. 963, 38 S. Ct. 430, 11 A. L. R. 611, *supra*, which is whether, as in *Browning* v. *Waycross, supra,* the transaction or activity was strictly local in character and particularly within the exclusive control of state authority, separate from interstate commerce and involving machines, apparatus or equipment which did not require a factory trained expert or engineer to supervise installation, construction or operation, but were of such character that these functions could be performed by local workmen skilled in the trade, or whether, as in *York Mfg. Co.* v. *Colley, supra,* the work required to be done by the contract is intrinsically related to and inherently connected with interstate commerce, and whether the installation was, because of some peculiar quality or complexity, essential to the making of the sale.

The case at bar clearly falls within the last classification. The installing of all sizes of furnaces and the assembling of the large ones when required was, under the special findings of the trial court, intrinsically related to and inherently a part of the sale; and because of their complexity their installation and testing was essential to the making of the sale.

The facts as found by the trial court show that the only work performed in Indiana was the putting together of the parts of the furnaces, and the installation and adjustment thereof. There is no evidence that the furnaces were made, built, fabricated, created or brought into existence in Indiana. For the reasons above stated, the transactions here involved are clearly sales of personal chattels in interstate commerce and the installation and reassembling where required, were inherently a part of, and a necessary incident to, the sale.

See also to the same effect as *York Mfg. Co.* v. *Colley* (1918), 247 U. S. 21, 62 L. Ed. 963, 38 S. Ct. 430, 11 A. L. R. 611, *supra; J. C. Boss Engineering Co.* v. *Gunderson Brick & Tile Co.* (1926), 168 Minn. 183, 209 N. W. 876; *Koppers Co.* v. *City of Milwaukee* (1926), 191 Wis. 397, 211 N. W. 147; *Creamery Package Mfg. Co.* v. *Cheyenne Ice Cream Co.* (1940), 55 Wyo. 277, 100 P. 2d 116; *Chuse Engine & Mfg. Co.* v. *Vromania Apt. Co.* (1911), 154 Mo. App. 139, 133 S. W. 624; *Stafford* v. *Wallace* (1922), 258 U. S. 495, 66 L. Ed. 735, 42 Sup. Ct. Rep. 397, 23 A. L. R. 229; *Samper* v. *Indiana Department of State Revenue* (1952), 231 Ind. 26, 106 N. E. 2d 797, 809; 11 A. L. R. Anno., p. 614; 101 A. L. R. Anno., p. 356; Cf: 55 A. L. R. Anno., p. 726.

*Fourth:* Having concluded that the transactions herein were sales of personal chattel in interstate commerce, we now proceed to consider whether the tax imposed by the State of Indiana upon the gross amount received from such sales is a burden upon interstate commerce within the meaning of Section 8 of Art. 1 of the Constitution of the United States.

The fact that the transactions herein constitute interstate commerce does not, of itself, determine whether the tax levied thereon offends the commerce clause of the Constitution, *Central Greyhound Lines* v. *Mealey* (1948), 334 U. S. 653, 655, 92 L. Ed. 1633, 68 S. Ct. 1260; and whether such transactions are in interstate commerce to such an extent as to forbid the State of Indiana to levy a tax upon the gross receipts therefrom, will be determined by the particular set of facts here before us. *Gross Income Tax Div.* v. *J. L. Cox and Son* (1949), 227 Ind. 468, 475, 86 N. E. 2d 693, 10 A. L. R. 2d 642.

As was stated by Justice Holmes in *Swift & Co.* v.

*United States* (1905), 196 U. S. 375, 399, 49 L. Ed. 518, 526, 25 S. Ct. 276, 280:

> "But it may be that the question of taxation does not depend upon whether the article taxed may or may not be said to be in the course of commerce between the states, but depends upon whether the tax so far affects that commerce as to amount to a regulation of it."

It is said in *Freeman* v. *Hewit* (1947), 329 U. S. 249, 91 L. Ed. 265, 272, 67 S. Ct. 274, 277:

> "Because the greater or more threatening burden of a direct tax on commerce is coupled with the lesser need to a State of a particular source of revenue, attempts at such taxation have always been more carefully scrutinized and more consistently resisted than police power regulations of aspects of such commerce."

In case of doubt as to the meaning or applicability of the gross income tax statute, it will be construed more strongly against the state and in favor of the taxpayer. *R. L. Shirmeyer, Inc.* v. *Ind. Revenue Bd.* (1951), 229 Ind. 586, 99 N. E. 2d 847, 849, and authorities there cited.

In support of their position that the tax herein is not a burden on interstate commerce, appellants rely upon the following authorities:

(1) *Central Greyhound Lines* v. *Mealey* (1948), 334 U. S. 653, 92 L. Ed. 1633, 68 S. Ct. 1260, *supra*. This case involved an attempt by the State of New York to impose a tax on the appellant's gross receipts from transportation between points within the State of New York but over routes that utilized the highways of Pennsylvania and New Jersey. The carrier contended that since the transportation taxed was interstate commerce the State of New York could not constitutionally

tax the gross receipts from such transportation and, in any event, it could validly tax only so much of these gross receipts as are attributable to the mileage within the state. At page 1641, 92 L. Ed., the court said: "By its very nature an unapportioned gross receipts tax makes interstate transportation bear more than 'a fair share of the cost of the local government whose protection it enjoys.' [Citing authority]. The vice of such a tax is that it lays 'a direct burden upon every transaction in [interstate] commerce by withholding, for the use of the State, a part of every dollar received in such transactions.' [Citing authorities]." The United States Supreme Court there held that on the record in that case the tax might constitutionally be sustained on the receipts from the transportation apportioned as to the mileage within the State of New York. Since the activities herein involved are wholly within interstate commerce, the above case does not lend support to appellants' attempt to sustain the validity of the tax here in question. On the contrary, the above quotation supports the position of the appellee.

(2) *Ott* v. *Mississippi Valley Barge Line Co.* (1949), 336 U. S. 169, 93 L. Ed. 585, 69 S. Ct. 432, involved the assessment for local ad valorem taxes on vessels owned by a carrier engaged in interstate commerce and used in the State of Mississippi. The assessment was based on the ratio between the total number of miles in the carrier's lines in the state and the total number of miles in the entire line. The court there held that interstate commerce can be made to pay its way by bearing a nondiscriminatory share of the tax burden which each state may impose on activities or property within its borders. The Gross Income Tax Act makes no provision for an apportionment of the tax, but even if it did the activ-

ities in the case at bar, which appellants are attempting to tax, are wholly in interstate commerce, and since the entire gross receipts which appellee receives from these activities are receipts wholly from interstate commerce, there is no basis for an apportionment, even if one were provided. There is no similarity between the tax levied in *Ott* v. *Mississippi Barge Line Co., supra,* and that involved in the case at bar. That case is clearly not authority for the imposition of the tax here in question.

(3)  *Gross Income Tax Div.* v. *J. L. Cox and Son* (1949), 227 Ind. 468, 86 N. E. 2d 693, 10 A. L. R. 2d 642, *supra.* In that case the gross income tax was levied upon the income derived from appellees' activities for services rendered in unloading and transporting materials used in the construction of pipe lines wholly within the State of Indiana. There this court held that the activities which were the source of the income taxed were performed wholly within the State of Indiana and that the fact that they received checks for their work from Cincinnati, Ohio, which were mailed to them in Missouri, did not make the transactions activities within interstate commerce. That case is clearly distinguished from the one at bar in that there the entire contract was performed wholly within the State of Indiana and the tax was levied under §64-2602, Burns' 1943 Replacement, which provides that the gross income tax shall be levied "upon the receipt of gross income derived from activities or businesses . . . within the state of Indiana, of all persons who are not residents of the state of Indiana, . . ." Since the activities in the case at bar were all in interstate commerce and none of the income was derived from local activities or business within the State of Indiana, the rule applied in the Cox case has no application to the case at

bar. It will be noted that this court there recognized that the tax could not be levied upon gross income from transactions in interstate commerce when, at page 474, 227 Ind., it said:

"We think it is undoubtedly true that if appellees' transactions from which they received the income upon which the tax was assessed, were transactions in interstate commerce which it was the duty of Congress alone to regulate, no gross income tax could lawfully be assessed thereon."

(4) *Department of Treasury* v. *Allied Mills, Inc.* (1942), 220 Ind. 340, 42 N. E. 2d 34, (affirmed 318 U. S. 740, 87 L. Ed. 1120, 63 S. Ct. 666), involved gross income arising from the sale of live stock and poultry feeds to resident customers in Indiana to whom deliveries were made from plants in Illinois, pursuant to orders taken in Indiana and accepted in Illinois. Allied Mills maintained factories at Fort Wayne, Indiana, Peoria, Illinois, and East St. Louis, Illinois, and was engaged in intrastate business in Indiana. The shipments there in question were made from the plants in Illinois as a convenience in shipment and for the purpose of taking advantage of favorable freight rates. The interstate nature of appellant's business was only incidental to interstate commerce and was a part of the local activities of Allied Mills within the State of Indiana. That case does not lend support to appellants' position in the case at bar.

(5) The United States Supreme Court in *Norton Co.* v. *Department of Rev.* (1951), 340 U. S. 534, 95 L. Ed. 517, 71 S. Ct. 377, vacated the judgment in *Norton Co.* v. *Department of Revenue* (1950), 405 Ill. 314, 90 N. E. 2d 737, and reversed that part of the Illinois Supreme Court decision pertaining to orders sent directly to the home office of the company by the

customer and on which goods were shipped directly to the customer in Illinois from Worcester, Massachusetts, and at page 521, 95 L. Ed., said:

"The only items that are so clearly interstate in character that the State could not reasonably attribute its [their] proceeds to the local business are orders sent directly to Worcester by the customer and shipped directly to the customer from Worcester. Income from those we think was not subject to this tax."

And at page 522, 95 L. Ed., in a concurring opinion, Justice Reed said: "Such sales, consummated by direct shipment to Illinois buyers from out of the state are interstate business and free of the tax Illinois has levied."

The foregoing cases, as do others cited and relied upon by appellants, involve the taxing of a purely local activity such as a sale within the state, the performance of a construction contract wholly within the state, or a tax or a license for the privilege of doing business within the state, and all are clearly distinguished from a tax on gross receipts from the sale of personal property by residents of a state outside of Indiana to a resident within this state. Other cases cited by appellants are not applicable to the factual situation before us and we do not deem it necessary to further extend this opinion by discussing them.

Appellants assert that we should follow the Supreme Court of Illinois and the Mississippi Supreme Court in their projection of the theory that if a tax does nothing more than place interstate commerce upon the same footing with local commerce, a tax levied thereon is valid. This argument was answered by the United States Supreme Court in *Freeman* v. *Hewit* (1947), 329 U. S. 249, 91 L. Ed. 265, 67 S. Ct. 274, *supra,* at page 273. when the court said:

"It has been suggested that such a tax is valid when a similar tax is placed on local trade, and a specious appearance of fairness is sought to be imparted by the argument that interstate commerce should not be favored at the expense of local trade. So to argue is to disregard the life of the Commerce Clause. Of course a State is not required to give active advantage to interstate trade. But it cannot aim to control that trade even though it desires to control its own. It cannot justify what amounts to a levy upon the very process of commerce across State lines by pointing to a similar hobble on its local trade. It is true that the existence of a tax on its local commerce detracts from the deterrent effect of a tax on interstate commerce to the extent that it removes the temptation to sell the goods locally. But the fact of such a tax, in any event, puts impediments upon the currents of commerce across the State line, while the aim of the Commerce Clause was precisely to prevent States from exacting toll from those engaged in national commerce."

This doctrine was recently affirmed in *Spector Motor Service* v. *O'Connor* (1951), 340 U. S. 602, 95 L. Ed. 573, 71 S. Ct. 508, and at pages 578, 579, 95 L. Ed., the court said:

"This court heretofore has struck down, under the Commerce Clause, state taxes upon the privilege of carrying on a business that was *exclusively* interstate in character. The constitutional infirmity of such a tax persists no matter how fairly it is apportioned to business done within the state."

It has been suggested that because, "The increasing social burdens assumed by our governments, both State and national, will require increasing and more searching taxation for their support."[1], we should follow the present trend of some of our courts and steer our course by principle, rather than

1. *Stone* v. *York Ice Machinery Corporation* (1942), 193 Miss. 638, 10 So. 2d 380, supra.

by precedent, in order to sustain questionable taxes when imposed and extended in an effort to secure additional revenue. We are not impressed with this suggestion, nor are we disposed to cut loose the moorings of the past and embark upon an uncharted sea without regard to precedent and with only the wavering compass of ever-shifting needs to guide us into uncharted seas, in order to meet the expense of increased burdens being assumed from year to year by our state and national governments. Principles never change, but their application may be varied to meet the needs of an advancing society. However, this does not require, or permit, a distortion of principles and time-honored precedents merely to satisfy the lust of a greedy and overindulgent, benevolent government.

The United States Supreme Court has consistently held that a tax on gross income from transactions in interstate commerce is an unconstitutional burden upon, or interference with, commerce among the states. The effect of taxing gross receipts from interstate commerce is the same as a direct tax upon the commerce itself.

The principles upon which this rule is based were enunciated by Chief Justice Marshall and have been elaborated upon in later decisions.[2]

*Philadelphia etc. Mail Steamship Co.* v. *Pennsylvania* (1887), 122 U. S. 326, 30 L. Ed. 1200, 7 S. Ct. 1118, involved the question of whether a state can constitutionally impose upon a steamship company a tax upon

2. See: *Brown* v. Maryland (1827), 12 Wheat. 419 (U. S. 1827), 6 L. Ed. 678, 687; *Philadelphia etc. Mail Steamship Co.* v. *Pennsylvania* (1887), 122 U. S. 326, 30 L. Ed. 1200, 7 S. Ct. 1118; *United States Glue Co.* v. *Oak Creek* (1917), 247 U. S. 321, 62 L. Ed. 1135, 1141, 38 S. Ct. 499; *Western Live Stock* v. *Bureau of Revenue* (1938), 303 U. S. 250, 82 L. Ed. 823, 58 S. Ct. 546, 115 A. L. R. 944; *Freeman* v. *Hewit* (1947), 329 U. S. 249, 91 L. Ed. 265, 67 S. Ct. 274, *supra*.

its *gross receipts* derived from the transportation of persons and property by sea, *between different states,* and to and from foreign countries. At page 1203, 30 L. Ed., the court said:

> "The tax in the present case is laid upon the gross receipts for transportation as such. . . . If such a tax is laid, and the receipts taxed are those derived from transporting goods and passengers in the way of interstate or foreign commerce, . . . it is an exaction aimed at the commerce itself, and is a burden upon it, and seriously affects it."

*Galveston, H. & S. A. R. Co.* v. *Texas* (1908), 210 U. S. 217, 52 L. Ed. 1031, 28 S. Ct. 638, was an action against a railroad to recover taxes equal to one per cent on its gross receipts, where a part, and in some instances the greater part, of such receipts were derived from the carriage of passengers and freight coming from, or destined to, points without the state. At page 1037, 52 L. Ed., the court said:

> "Neither the state courts nor the legislatures, by giving the tax a particular name or by the use of some form of words, can take away our duty to consider its nature and effect. If it bears upon commerce among the states so directly as to amount to a regulation in a relatively immediate way, it will not be saved by name or form. [citing authorities.]
>
> "We are of opinion that the statute levying this tax does amount to an attempt to regulate commerce among the states."

*Meyer* v. *Wells, Fargo, & Co.* (1912), 223 U. S. 298, 56 L. Ed. 445, 32 S. Ct. 218, involved a gross revenue tax upon the property and assets of corporations equal to three per cent of the gross receipts "from every source whatsoever." At page 447, 56 L. Ed., the court said:

"The plaintiff's receipts are largely from commerce among the states, and it also receives large sums as income from investments in bonds and land all outside the state of Oklahoma. So that it is evident that if the tax is what it calls itself, it is bad on the former ground, and that whatever it is, it is bad on the latter."

And further, at page 448:

". . . it is a tax on a proportion of total gross receipts a considerable part of which, as we have explained, the state has no right to tax. Neither the court below nor this court can reshape the statute simply because it embraces elements that it might have reached if it had been drawn with a different measure and intent."

*Alpha Portland Cement Co.* v. *Massachusetts* (1925), 268 U. S. 203, 69 L. Ed. 916, 45 S. Ct. 477, 44 A. L. R. 1219, involved an excise tax which the State of Massachusetts attempted to impose upon a foreign corporation doing an interstate business within the state measured by the proportion of capital shares and net income attributed to such transactions. It was conceded by the Attorney General of Massachusetts that the company was engaged in Massachusetts exclusively in interstate commerce and the Supreme Court so held. While that case involved the tax upon the entire net income of the corporation, the principle there applied may be equally applied to the facts in the case at bar. At page 924, 69 L. Ed., the court quoted from *St. Louis Southwestern R. Co.* v. *Arkansas,* 235 U. S. 350, 364, 59 L. Ed. 265, 272, 35 Sup. Ct. 99, as follows:

" 'So far as the commerce clause is concerned, it seems to us that the principles upon whose application the present decision must depend are those set forth in Postal Teleg. Cable Co. v. Adams, 155 U. S. 688, 695, 39 L. Ed. 311, 315, 5 Inters. Com. Rep. 1, 15 Sup. Ct. Rep. 268, 360, where the court by Mr. Chief Justice Fuller, said: "It is settled that

where, by way of duties laid on the transportation of the subjects of interstate commerce, or on the receipts derived therefrom, or on the occupation or business of carrying it on, a tax is levied by a state on interstate commerce, such taxation amounts to a regulation of such commerce and cannot be sustained." . . . ' ".

*New Jersey Bell Teleph. Co.* v. *State Bd. of T. and A.* (1930), 280 U. S. 338, 74 L. Ed. 463, 50 S. Ct. 111, involved an act of the State of New Jersey imposing a tax on all the property and franchises of persons, corporations, etc. using or occupying public streets, highways, roads or public places based upon a proportion of the gross receipts of the taxpayer to be determined according to the provisions of the act. Appellant operated a telephone business in the State of New Jersey and all of its lines and property were within that state. A large part of the company's receipts were for transmission and receipt of messages over connecting lines between places in New Jersey and in other states and countries. The act required appellant's gross receipts in New Jersey to be included for the calculation of the franchise tax assessed. At page 467, 74 L. Ed., the court said:

"It is elementary that a state may tax property used to carry on interstate commerce. But, as the Constitution vests exclusively in the Congress power to regulate interstate and foreign commerce, a state may not tax, burden or interfere with such commerce or tax as such gross earnings derived therefrom or impose a license fee or other burden upon the occupation or the privilege of carrying on such commerce, whatever may be the instrumentalities or means employed to that end. [Citing authorities]. This tax cannot be sustained if it is not upon the property, but is in fact a tax upon appellant's gross receipts from interstate and foreign commerce or a license fee to be computed thereon."

*Puget Sound Stevedoring Co.* v. *Tax Commission* (1937), 302 U. S. 90, 82 L. Ed. 68, 58 S. Ct. 72, involved a tax of the State of Washington for the privilege of engaging in business activities within the state based upon a percentage of the value of the products or the gross receipts of sales on certain classes of business, in this case the business of a stevedoring company, which rate was one-half of one per cent of the gross income of the business. At page 72, 82 L. Ed., the court said:

> "The business of loading and unloading being interstate or foreign commerce, the state of Washington is not at liberty to tax the privilege of doing it by exacting in return therefor a percentage of the gross receipts. Decisions to that effect are many and controlling. [Citing authorities]."

*Western Live Stock* v. *Bureau of Revenue* (1938), 303 U. S. 250, 82 L. Ed. 823, 58 S. Ct. 546, 115 A. L. R. 944, *supra,* involved a privilege tax imposed by the State of New Mexico upon the gross receipts of those engaged in certain specified businesses. The question there before the court was whether the tax laid under this statute on the gross income of appellants received from advertisers for space in a journal which was published in New Mexico and circulated to subscribers within and without the state imposed a constitutional burden on interstate commerce. Following a lengthy discussion of the various types of taxes which might be lawfully imposed upon interstate commerce, including property taxes, use tax, net income tax, and franchise taxes of various kinds, the court, at pages 827, 828, 82 L. Ed., said:

> "All of these taxes in one way or another add to the expense of carrying on interstate commerce, and in that sense burden it; but they are not for

that reason prohibited. On the other hand, local taxes, measured by gross receipts from interstate commerce, have often been pronounced unconstitutional. The vice characteristic of those which have been held invalid is that they have placed on the commerce burdens of such a nature as to be capable, in point of substance, of being imposed [Citing authorities] with equal right by every state which the commerce touches, merely because interstate commerce is being done, so that without the protection of the commerce clause it would bear cumulative burdens not imposed on local commerce. [Citing authorities]. The multiplication of state taxes measured by the gross receipts from interstate transactions would spell the destruction of interstate commerce and renew the barriers to interstate trade which it was the object of the commerce clause to remove. [Citing authority].

"It is for these reasons that a state may not lay a tax measured by the amount of merchandise carried in interstate commerce, [Citing authorities] . . . ."

*Gwin, White & Prince* v. *Henneford* (1939), 305 U. S. 434, 83 L. Ed. 272, 59 S. Ct. 325, involved the question of whether a tax imposed by the State of Washington and measured by the gross receipts of appellant from its business of marketing fruit shipped from Washington to the place of sale in various states and foreign countries was a burden on interstate and foreign commerce. At page 275, 83 L. Ed., the court said:

"Both the compensation and the tax laid upon it are measured by the amount of the commerce—the number of boxes of fruit transported from Washington to purchasers elsewhere; so that the tax, though nominally imposed upon appellant's activities in Washington, by the very method of its measurement reaches the entire interstate commerce service rendered both within and without the state and burdens the commerce in direct proportion to its volume."

And further, at page 276,

"But it is enough for present purposes that under the commerce clause, in the absence of congressional action, state taxation, whatever its form, is precluded if it discriminates against interstate commerce or undertakes to lay a privilege tax measured by gross receipts derived from activities in such commerce which extend beyond the territorial limits of the taxing state. Such a tax, at least when not apportioned to the activities carried on within the state, [Citing authorities] burdens the commerce in the same manner and to the same extent as if the exaction were for the privilege of engaging in interstate commerce and would, if sustained, expose it to multiple tax burdens, each measured by the entire amount of the commerce, to which local commerce is not subject."

Mr. Justice Butler and Mr. Justice McReynolds, in a concurring opinion, said, at page 278, 83 L. Ed.:

"Appellant is engaged exclusively in interstate commerce, a part of which is carried on in the State of Washington. For the privilege of doing that business the state statute purports to tax its gross earnings at the rate of one-half of one per cent. The exaction is plainly repugnant to the commerce clause. [Citing many authorities]."

The Supreme Court has twice declared the Indiana Gross Income Tax to be a burden on interstate commerce when levied upon the gross receipts derived from such commerce and when so levied it violates Art. 1, §8 of the Constitution of the United States.

In *J. D. Adams Mfg. Co.* v. *Storen* (1938), 304 U. S. 307, 82 L. Ed. 1365, 58 S. Ct. 913, 117 A. L. R. 429, the question of the threatened imposition of the tax on the gross income from appellant's sales in interstate commerce was presented.

The Supreme Court in this opinion ably distinguished

this tax from those which may be lawfully imposed for the privilege of doing business, as charter fees, franchise taxes or fees, excise property taxes, and those of like nature and defined the Indiana Gross Income Tax as "a tax upon gross receipts from commerce." The tax there was sought to be imposed upon the gross receipts derived from appellant's sales to customers in other states and in foreign countries. At page 1369, 82 L. Ed., the court said:

> "The vice of the statute as applied to receipts from interstate sales is that the tax includes in its measure, without apportionment, receipts derived from activities in interstate commerce; and that the exaction is of such a character that if lawful it may in substance be laid to the fullest extent by states in which the goods are sold as well as those in which they are manufactured. Interstate commerce would thus be subjected to the risk of a double tax burden to which intrastate commerce is not exposed, and which the commerce clause forbids. We have repeatedly held that such a tax is a regulation of, and a burden upon, interstate commerce prohibited by Article 1, §8 of the Constitution."

Another phase of the Indiana Gross Income Tax Act was before the United States Supreme Court in *Freeman* v. *Hewit* (1947), 329 U. S. 249, 91 L. Ed. 265, 67 S. Ct. 274, *supra,* and involved the sale of securities on the New York Stock Exchange by brokers in New York. At page 273, 91 L. Ed., the court said:

> "This case, like J. D. Adams Mfg. Co. v. Storen, . . . involves a tax imposed by the State of the seller on the proceeds of interstate sales."

And further, at page 274:

> "Taxes which have the same effect as consumption taxes are properly differentiated from a direct imposition on interstate commerce, such as was

before the Court in the Adams Case and is now before us. The tax on the sale itself cannot be differentiated from a direct unapportioned tax on gross receipts which has been definitely held beyond the State taxing power . . . ."

See to the same effect as the foregoing:[3] *Gross Income Tax Div.* v. *Strauss* (1948), 226 Ind. 329, 331, 79 N. E. 2d 103, (Cert. denied 335 U. S. 860, 93 L. Ed. 406, 69 S. Ct. 135) ; *Fargo* v. *Stevens* (1887), 121 U. S. 230, 30 L. Ed. 888, 7 S. Ct. 857; *Norton Co.* v. *Department of Rev.* (1951), 340 U. S. 534, 95 L. Ed. 517, 71 S. Ct. 377, *supra; Spector Motor Service* v. *O'Connor* (1951), 340 U. S. 602, 95 L. Ed. 573, 71 S. Ct. 508, *supra; Nashville C. & St. L. R. Co.* v. *Wallace* (1933), 288 U. S. 249, 77 L. Ed. 730, 738, 53 S. Ct. 345, 87 A. L. R. 1191; *Commissioner of Corp. & Tax'n.* v. *Ford Motor Co.* (1941), 308 Mass. 558, 33 N. E. 2d 318, 139 A. L. R. 936, 947; 44 A. L. R. Anno. p. 1228; 154 A. L. R. Anno. p. 629 (2).

In the case at bar the tax sought to be recovered was levied upon the gross receipts of appellee from interstate commerce transactions within and without the State of Indiana. A tax upon the gross receipts from such commerce is, in effect, a tax upon the commerce itself and, as such, interferes with and burdens such commerce in proportion to the amount of the tax levied. If Indiana can tax the gross receipts derived from the commerce here in question, simply because they are income from activities which are in interstate commerce, then the State of Ohio may also tax the same receipts for the same reason.

The free flow of commerce across state lines is a

3. For discussions of state taxation of Interstate Commerce, See: 27 Cal. L. Rev. 336; 40 Col. L. Rev. 653; 56 Yale L. J. 898; Vand. L. Rev., Vol. 4, No. 3, p. 496.

vital and indispensable part of the economic life and political existence of our country. A tax upon the gross receipts derived from activities in interstate commerce affects each transaction in proportion to its size and without regard to whether or not it is profitable. It is entirely possible that such a tax may be sufficient to make the difference between profit and loss, or to so reduce the profit as to impede or discourage the conduct of commerce.

The tax levied against appellee herein is a direct tax upon the gross income (receipts) derived from sales in interstate commerce and, as such, directly burdens, and interferes with, the free flow of such commerce between the State of Ohio and the State of Indiana and is invalid as being in conflict with Article I, of §8 of the Constitution of the United States.

It is argued that a different situation maintains than that present in the *J. D. Adams Mfg. Co.* v. *Storen* (1938), 304 U. S. 307, 82 L. Ed. 1365, 58 S. Ct. 913, 117 A. L. R. 429, *supra,* and *Freeman* v. *Hewit* (1947), 329 U. S. 249, 91 L. Ed. 265, 67 S. Ct. 274, *supra,* cases because the goods in this case were shipped into Indiana instead of being shipped from Indiana to another state.

When goods or chattels are shipped from one state to another, it is interstate commerce and the direction of the flow does not change that characteristic. The imposition of a tax on the gross receipts of such commerce is no less a burden thereon, or interference therewith, because such receipts are taxed by the state into which the commerce flows rather than by the state of its source. *Fargo* v. *Stevens* (1887), 121 U. S. 230, 30 L. Ed. 888, 892, 7 S. Ct. 857, *supra; Philadelphia etc. Mail Steamship Co.* v. *Pennsylvania* (1887), 122 U. S. 326, 30 L. Ed. 1200, 1202, 7 S. Ct. 1118, *supra.*

The transactions herein being interstate commerce and a tax upon the gross receipts therefrom being an unconstitutional burden upon such commerce, the judgment of the lower court should be affirmed.

Having reached this conclusion it is not necessary to consider the other questions raised by the briefs, or to consider appellee's cross-errors.

Judgment affirmed.

Emmert, C. J., not participating.

NOTE.—Reported in 111 N. E. 2d 50.